[No. 4048.  Decided December 13, 1901.]

WILLIAM DEERING, *Appellant*, v. IDA HOLCOMB, *Respondent*.

FRAUDULENT CONVEYANCES — LIMITATIONS — KNOWLEDGE OF ATTOR-
NEY CONSTITUTES NOTICE TO CLIENT.

Knowledge by plaintiff's attorney of facts sufficient to put him
on inquiry as to fraud on the part of defendant constitutes such
notice to both the attorney and his client as to be equivalent to
discovery of the fraud sufficient to start the running of the stat-
ute of limitations.

SAME.

The fact that an attorney does not inform his client of knowl-
edge on his part indicating fraud on the part of defendant would
not be ground for the client's asserting want of constructive no-
tice on his part, when there is no showing of collusion between
such attorney and the adverse party.

SAME — PROPERTY EXEMPT FROM ATTACK.

Although a transfer of capital stock may have been originally
fraudulent as to creditors, yet property purchased with the divi-
dends on such stock cannot be charged with the original fraud,
so as to subject it to the claims of creditors, where no action
could have been maintained against the transfer of the stock,
because of the bar of the statute.

SAME — SEPARATE CREDITORS OF HUSBAND CANNOT ATTACK TRANSFER
OF COMMUNITY PROPERTY.

A conveyance by the husband to his wife of community realty
is not a fraudulent conveyance as against creditors of the hus-
band upon his separate debts.

SAME — GIFT BY HUSBAND TO WIFE — SOLVENCY OF HUSBAND.

A gift by a debtor to his wife will be upheld as a legal trans-
fer, instead of a fraudulent conveyance. where, after making it,
he has ample means left to discharge all of his pecuniary obliga-
tions.

COSTS ON APPEAL — BRIEFS — DUPLICATION OF MATTER.

Where appellant has printed in his opening brief the findings
of fact made by the court, the respondent, though prevailing on
the appeal, is not entitled to have costs taxed in his favor for
that portion of his brief in which he reprints the findings of fact.

Appeal from Superior Court, Pacific County.—Hon.
HENRY S. ELLIOTT, Judge. Affirmed.

*H. W. B. Hewen,* for appellant.

*Welsh & Thorp,* for respondent.

The opinion of the court was delivered by

WHITE, J.—In 1887, in Minnesota, the appellant re-
covered a judgment against George U. Holcomb and his
father, S. Holcomb, for $445.66. On this judgment, on
the 18th of November, 1893, in the superior court of
Washington, for the county of Pacific, judgment was re-
covered against said George U. Holcomb for $766.08, on
which there was due and unpaid at the time this action
was brought the sum of $1,142. Execution was not issued
on this judgment until August 9, 1898, and it was returned
unsatisfied September 13, 1898. This judgment has been
renewed. Ida Holcomb was the wife of George U. Hol-
comb at the time said judgment was recovered against him
in Minnesota, and lived there with him until April, 1886,
when he abandoned her and their infant child and came
to this state. In 1889 he wrote to the respondent, Ida
Holcomb, that if she would come and live with him, he
would never abandon her again, but would provide for,
and make suitable provision for her and her child. Under
this promise she rejoined her husband in this state in 1889.
In 1889-1891, George U. Holcomb and respondent lived
at South Bend, Washington; and George U. Holcomb was
the general manager and a director of the South Bend
Land Company, a corporation largely engaged in deal-
ing in real estate and town lots. He was very influential
in the management of the company, and was one of its
promoters. In 1890 the value of the holdings of this
company was $50,000, and on April 26, of that year,

George U. Holcomb owned 699 out of 2400 shares of the capital stock of the company. On that day he surrendered to the company the said 699 shares, and there was re-issued by the company in lieu thereof 399 shares to respondent, and 300 to said George U. From that time said respondent held and claimed to own said 399 shares, with the exception of one share, which she transferred to Mr. Stratton, who acted as her attorney from 1895 or 1896 in the affairs of the company. On July 5, 1893, George U. sold and transferred his 300 shares, except one share, to the First National Bank of South Bend. From March 2, 1891, to October 4, 1893, dividends on the capital stock of said company amounting to $201,300 were paid. The first three dividends amounted to $120,000, and the share of the respondent in this, as shown by the books of the company, was paid to her, and her share of the balance, as shown by the books of the company, was paid to George U., who was also paid the dividends on his own stock. In 1891-1893, George U. had on deposit, in his own name, in the banks of South Bend large sums of money, and, until the latter part of 1893, he was solvent,—had more than sufficient money to pay his debts. In April, 1890, certain lots were conveyed to respondent by the South Bend Land Company for the consideration of $1,500, as expressed in the deed, and the deed for these lots was recorded in the auditor's office of Pacific county April 21, 1890. In 1890, while respondent and her husband were living together, there was constructed on this property a residence costing $6,000, in which George U. and the respondent resided until George U. left the state, in 1894. Various other lots in South Bend were conveyed to the respondent by the South Bend Land Company. The deeds for the same were recorded in the auditor's office of Pacific county immediately after the

conveyances were made, generally at the request of the
South Bend Land Company. Three of these deeds were
recorded April 14, 1890, one August 8, 1891, one Novem-
ber 12, 1891, one September 4, 1896. Lots in South
Bend by another grantor were conveyed to respondent.
The deed for the same was recorded in the auditor's office
of Pacific county on February 13, 1890. The residence
of George U. Holcomb and wife was well and expensively
furnished, the furniture being bought in 1890. In 1890
thirty-five shares, of the par value of $100 each, of the
capital stock of the First National Bank of South Bend,
were issued to the respondent, and the same were, in May,
1894, transferred to George U. Holcomb, who afterwards
sold the same. In May, 1894, George U. Holcomb and
respondent were divorced. The transfer of the bank
stock was made while the divorce proceedings were pend-
ing, the said George U. then agreeing that all of the
property mentioned in the complaint was the separate
property of the respondent. The appellant was ignorant
of the whereabouts of George U. Holcomb after he left
Minnesota until October, 1891. When, in October, 1891,
he found out that George U. Holcomb was at South Bend,
he at once commenced efforts to realize on the Minnesota
judgment and made arrangements with M. D. Egbert, an
attorney at South Bend, to look after his interests, and
since 1891 M. D. Egbert and Hewen & Stratton, attorneys
at South Bend, under the employment of appellant, have
been looking after the interest of the appellant in his
claim against George U. Holcomb. The attorneys named
were the attorneys who recovered the judgment in 1893
in the superior court of Pacific county. The present
action was commenced October 18, 1898, by H. W. B.
Hewen, Esq., of Hewen & Stratton, as attorney for the
appellant.

The appellant alleged in his complaint that respondent claims all of the above mentioned property as her separate property, and not as community property. This the respondent admits in her answer. The appellant further avers that, after the contraction of the debt on which the aforesaid judgment was recovered, George U. Holcomb and the respondent fraudulently confederated and conspired together for the purpose of hindering, delaying, and defrauding the appellant in the collection of his said debt, and for the purpose of defeating and preventing its collection, by the transfer, without any consideration, of said property to said respondent, and that all of the aforesaid property, in pursuance of said conspiracy, was put in the name of the respondent, but that at all times George U. Holcomb was, and still is, the true and beneficial owner of said property. Appellant further alleges in his complaint that he was ignorant of the fraudulent agreement and the frauds alleged in making said conveyances until about July, 1897, and he has used and needed the time since July, 1897, in fully investigating the same. It is further alleged that he was ignorant of the whereabouts of said George U. Holcomb from 1887 until 1891, although he made diligent efforts to discover the same. The appellant prays that the aforementioned shares of stock in the South Bend Land Company, the real estate conveyed to the respondent, and the furniture and house, be charged with the payment of his judgment. The answer denies the frauds alleged, and alleges that the property mentioned in the complaint was and is the separate property of the said respondent. Respondent claims to have paid her husband in 1890 $1,000 for the 399 shares of stock in the South Bend Land Company, and for the five lots where the residence was erected; and she further claims that the other property was property purchased

with the dividends from the stock of the South Bend Land Company owned by her and—a small portion of it —out of the allowance made for family support. She claims to have earned part of the money with which she bought the stock as a school teacher in Minnesota when she was abandoned by her husband, and to have received a part of it as a gift from her mother and brother. She further pleads that the debt upon which the judgment was recovered was the separate debt of George U. Holcomb, and not a community debt. She also alleged that in 1894 she was divorced from George U. Holcomb, and that pending said divorce it was agreed between her and George U. that the property in controversy was her separate property. She further pleads "that the cause of action set forth in appellant's complaint did not accrue within three years before the commencement of the action, and that for more than three years prior to the commencement of the action appellant personally, and also by and through his agents and attorneys, knew all of the things which he alleged in his complaint were the facts which constituted the fraud and fraudulent agreement on the part of the respondent, Ida Holcomb and George U. Holcomb, and each of them, and others, and said cause of action is barred by the statute of limitations." The appellant denied the allegations of the answer relative to the statute of limitations, and in other particulars. The court found on all the issues in favor of the respondent, and dismissed the action.

We will first consider the evidence in support of the statute of limitations, and the rule of law applicable to the same. The statute of limitations, which the appellant seeks to avoid by the averment in his complaint that he was ignorant until 1897 of the fraudulent agreement therein alleged, between respondent and George U. Hol-

comb, and which is relied upon by the respondent, is as follows: "Within three years. . . . 4. An act for relief upon the ground of fraud, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud." Bal. Code, § 4800. The statute of limitations is not an unconscionable defense. *Morgan v. Morgan,* 10 Wash. 99 (38 Pac. 1054).

"Statutes of limitation are vital to the welfare of society, and are favored in the law. They are found and approved in all systems of enlightened jurisprudence. They promote repose, by giving security and stability to human affairs. An important public policy lies at their foundation. They stimulate to activity and punish negligence. While time is constantly destroying the evidence of rights, they supply its place by a presumption which renders proof unnecessary. Mere delay, extending to the limit prescribed, is itself a conclusive bar. The bane and the antidote go together." *Wood v. Carpenter,* 101 U. S. 135.

According to the testimony of Mr. McMath, who represented the appellant in the East, when it was discovered that George U. Holcomb was living at South Bend, efforts were at once commenced to realize on the Minnesota judgment, and arrangements were made with M. D. Egbert, an attorney at South Bend, to look after this claim. This was in October, 1891, and since that time M. D. Egbert and Hewen & Stratton have been looking after such claim. M. D. Egbert, called as a witness by the appellant, testified that he has resided in South Bend since the 25th day of April, 1890, and that he was acquainted with George U. Holcomb in 1890; that in 1890 he visited with said George U. Holcomb while the house, built on the lots deeded to the wife by the South

Bend Land Company for $1,500, was in course of con-
struction, and that George U. Holcomb and another were
talking about altering the house; that at that time, in
speaking of the ownership of the property, George U.
said the property was to be his wife's; that he wanted
to suitably reward her; that she had followed him around
from post to pillar and he wanted to give her the home
and fix her the best he could; that she had no adequate
reward for staying back in Minnesota. He testified he
could not tell from whom he learned that the property
was transferred to the wife; that he *always* knew it was
in her name; that he knew it was in her name from about
the time of that visit; that he knew pretty near what was
going on in the land company. Called as a witness by
the respondent, he further testified that he thought he
received the appellant's judgment for collection in the
summer of 1893, and that he obtained Hewen & Stratton to
assist him in the prosecution of the matter; that shortly
after the judgment was rendered—a few days—his at-
tention was called to the fact of the transfer of the 399
shares of the capital stock of the South Bend Land Com-
pany to the respondent, and he felt convinced that it was
a fraudulent transfer,—not that the respondent knew it,
—and was to cover up George U. Holcomb's property; that
he had been informed at that time that the books of the
South Bend Land Company showed how the transfer
was. He was asked the question, "Why did you not pro-
ceed to collect the judgment then—why did you not pro-
ceed with this action to set aside the conveyance?" and he
answered, "For two or three reasons; one of them a senti-
mental one, perhaps. I felt that, even though the judg-
ment could be collected and the conveyance set aside,
that between a great corporation, worth millions of dol-
lars, and a poor widow with a child, I would cling to the

side of mercy and charity, and said nothing about it. I may have had my scruples about the ability to collect it even then. The claim was in the hands of Hewen & Stratton, and, if they desired to go ahead with it they could do it." He further testified that he was a good friend of the respondent; that he was willing the claim should be collected from George U. and his father; that this was the reason he did not take action in the matter; that his conscience excused him whether the ethics of the profession would or not. Mr. Hewen, of Hewen & Stratton, also testified that they searched the county records after the recovery of the judgment in 1893.without being able to find any property in the name of George U. Holcomb; that he (Hewen) watched the divorce proceedings between respondent and George U. Holcomb (May, 1894), with the hopes of discovering property of George U. Holcomb. The deeds to the respondent for the real estate sought to be charged with the payment of the judgment (with the exception of a deed recorded September 4, 1896, of which we will speak later on), were all of record in the auditor's office at the time the judgment was recovered in 1893, and at the time Mr. Hewen examined these same records to find property of George U. Holcomb. While it is true that Mr. Egbert testified that he thinks he was first employed to look after this claim in the summer of 1893, Mr. McMath, who had all the correspondence about the claim, and who had carefully examined the same, testifies that he was employed as early as October, 1891. As to the real estate upon which the dwelling house was erected, Mr. Egbert testifies that he knew from 1890 it was in the wife's name, and that he *always* knew it was in her name; he knew at the same time that it was being fitted up as a home especially for the wife and child, and also knew as early as 1893 of the transfer of the 399 shares of capital stock of

the South Bend Land Company to the wife, and knew pretty near what was going on in the land company.

It is a general rule that notice to the attorney is notice to his client; that this rule applies to all notices arising in the progress of a case, or as to other matters in which the relation of attorney and client exists at the time of the notice, and it applies not only to knowledge acquired by the attorney in the particular transaction, but to knowledge acquired by him in a prior transaction in which he acquired material information, if the information was so precise and definite that it is or must be present to his mind and memory in the last transaction. *The Distilled Spirits,* 11 Wall, 356; 2 Pomeroy, Equity Jurisprudence, § 672; *Wittenbrock v. Parker,* 102 Cal. 93 (36 Pac. 374, 24 L. R. A. 197, 41 Am. St. Rep. 172).

The attorneys of the appellant and the appellant himself had constructive notice that a large amount of real estate was conveyed to the wife, as early as 1890 and 1891, by the South Bend Land Company. The attorney who brought this action before 1894 examined the records in the auditor's office of Pacific county for property in the name of George U. Holcomb, and, under our system of indexing, necessarily must have obtained on such examination actual knowledge of the conveyance to respondent by the land company. The attorneys knew in 1894 that George U. Holcomb was insolvent, knew that the respondent was the wife of George U. Holcomb; knew that the real estate was conveyed to the wife; knew, or could have easily ascertained, that George U. Holcomb was the manager of the South Bend Land Company; knew, or could have easily ascertained, that the wife was of limited means before she came to Washington. The real estate in her name, under the circumstances,—her husband being insolvent, as claimed,—was certainly sufficient notice to put

them on inquiry; and had they inquired, they would
have obtained the same information in 1893 and 1894 as
to the consideration and circumstances of the transfers as
they did in 1898, on the trial of this action. Our statute,
in effect, says that the cause of action is deemed to have
accrued when the fraud is discovered. What is discovery?
We answer, notice of the fraud. What is notice? This
we can best answer in the language adopted by the supreme
court of the United States:

" 'Whatever is notice enough to excite attention, and
put the party on his guard, and .call for inquiry, is notice
of everything to which such inquiry might have led.
When a person has sufficient information to lead him to a
fact, he shall be deemed conversant of it' . . . 'The
presumption is that if the party affected by any fraudulent
transaction or management might, with ordinary care and
attention, have seasonably detected it, he seasonably had
actual knowledge of it.' " *Wood v. Carpenter,* 101 U. S.
135; *Martin v. Smith,* 1 Dill. 86; *Carr v. Hilton,* 1 Curt.
390; *Morgan v. Morgan, supra; Wickham v Sprague,* 18
Wash. 466 (51 Pac. 1055) ;*Hecht v. Slaney,* 72 Cal. 363
(14 Pac. 88); *Wright v. Davis,* 28 Neb. 479 (44 N. W.
490, 26 Am. St. Rep. 347) ; *Hawley v. Page,* 77 Iowa, 239
(42 N. W. 193, 14 Am. St. Rep. 275).

A party defrauded must be diligent in making inquiry.
The means of knowledge are equivalent to knowledge.
A clue to the fact, which, if followed up diligently would
lead to a discovery, is in law equivalent to discovery,—
equivalent to knowledge. *Norris v. Haggin,* 28 Fed. 275.

Mr. Egbert, one of the attorneys when the judgment
was recovered in 1893, had actual knowledge of the prob-
able value of the home and its appurtenances; that the
husband had given it to the wife, had furnished it for
her, and had given to her 399 shares of the capital stock
of the South Bend Land Company. The knowledge of

these transactions had by Mr. Egbert, if investigated, would have led to the discovery of the fraud, if any, set up in the complaint, as early as 1893. This was not only constructive notice to the appellant, but was constructive notice to Hewen & Stratton, Egbert's associates in the business of looking after the claim. *Wittenbrock v. Parker,* 102 Cal. 93.

The deed to respondent in 1896 by the South Bend Land Company for two lots in South Bend was long after the respondent was divorced from George U. Holcomb. The South Bend Land Company was indebted to the respondent on account of dividends on her capital stock, and this deed was delivered to her in part payment of these dividends. If the transfer of the stock is rendered valid by the lapse of time, property purchased with the dividends cannot be charged with the original fraud. But the appellant claims that the knowledge of Egbert should not be imputed to the appellant and his associates, Hewen & Stratton, because out of personal friendship for respondent Mr. Egbert did not see fit to institute this action in 1893. The only instance wherein notice to the attorney does not constitute notice to the client is where the attorney, in collusion with the adverse party, suppresses the information that he may have. The respondent did not know that Egbert had suppressed such information. She never advised with him relative to the suppression of such information. There is not a scintilla of evidence offered to show that there was any collusion between the respondent and Ebgert. The fact that Egbert did not inform his client of the knowledge he had cannot militate against respondent, Ida Holcomb, as she was in no way to blame for the failure to give such information. If the attorney did not proceed with his action when he

obtained the knowledge, that is a matter between the attorney and appellant, under the circumstances disclosed in this case, with which the respondent had nothing to do, and which in no way binds her. We think that the evidence overwhelmingly sustains the defense of the statute of limitations.

The evidence clearly shows that the debt due from George U. Holcomb, to the appellant was the separate debt of George U. Holcomb, and was not a community indebtedness in any sense of the term. That being the case, real estate acquired in this state by George U. Holcomb and wife in the manner the real estate in controversy is shown to have been acquired was community real estate, and was not subject to execution for the payment of the separate debts of the husband. It is immaterial whether such real estate stands in the name of the husband or wife. The conveyance of such real estate to the wife is not even evidence of fraud. The husband could give his interest in such real estate to the wife, and no one could question the good faith of such a transaction but the creditors of the community. The appellant is not such a creditor, and a transfer of such property is a matter of no concern to him. Bump, Fraudulent Conveyances (4th ed.), § 220.

George U. Holcomb testifies that in drawing the last three dividends on his wife's share of stock he was acting as her agent. There is no evidence to contradict this. There is no evidence in this case in any way tending to support the allegation of the complaint that the respondent holds any of the property in controversy in trust for the benefit of George U. Holcomb. The most favorable construction, in favor of the appellant, that can be put upon the testimony, is that George U. Holcomb made a gift of the 399 shares of stock, and the furniture in the house,

and the dwelling house, and his interest in the real estate, to the respondent. This gift was made in 1890. George U. Holcomb was solvent at the time, and the gift in no manner crippled him financially. The evidence fully shows that until 1893 he had a large bank account, sometimes as high as $15,000 on deposit, and that the stock retained by him in the land company was worth over $100,000, and paid large dividends. It is the sacred duty of a husband and father to provide for his wife and children. George U. Holcomb's wife had rejoined him in this state after he had abandoned her and his child. She came to him because he said he would make suitable provision for her and her child. When the stock in the land company was given to the wife, it was not of much value but afterwards rose to be worth three or four hundred dollars per share. We understand the rule of law to be that if the debtor, after making a gift, has ample means left to discharge all of his pecuniary obligations, the gift cannot be said to be a fraudulent disposition of his property, and it will be upheld. Bump, Fraudulent Conveyances (4th ed.), § 263, and cases cited.

The judgment of the court below is, therefore, affirmed with costs to the respondent.

REAVIS, C. J., and DUNBAR, ANDERS, MOUNT, FULLERTON and HADLEY, JJ., concur.

ON MOTION TO RETAX COSTS.

PER CURIAM. This is a motion by appellant to retax costs, for the reason that one dollar per page is an unreasonable price for printing the briefs; the assertion being that seventy cents per page is the customary price. A second objection is that pages from 7 to 23, inclusive, of respondent's brief, contain only the findings of fact made

by the trial court, all of which had been already printed in full in appellant's brief. The clerk of this court, in taxing the costs, has allowed eighty cents per page for printing respondent's brief, and we think the record shows conclusively that that was the customary price for briefs of this size in Pacific county. There seems to be no good purpose subserved, however, in the printing by respondent in her brief of the findings of fact after they had been printed in the brief of appellant, as they had in this case. The briefs of appellant and respondent are consulted together by members of this court, and, the rule requiring the printing of the findings of fact being for the benefit of the court, there is no necessity for incurring the expense of again printing them in respondent's brief. The costs will therefore be retaxed to the extent of disallowing the expense of printing the seventeen pages of respondent's brief which contain the statement of facts as printed in appellant's brief. As so corrected, the cost bill is approved.