<hr />

[No. 16165.  Department One.  April 1, 1921.]

GUSTAVE BRANDT et al., Appellants, v. BENJAMIN GOLDEN, Respondent.[1]

LIMITATION OF ACTIONS (56)—FRAUD—DISCOVERY.  Under Rem. Code, § 159, barring an action for fraud unless prosecuted within three years after its discovery, one who purchased an eleven-acre orchard tract on the misrepresentation that it was free from frost, and that the waste land amounted to one and one-half acres, when in fact it amounted to two and one-half acres, failed to establish a right to rescind where the evidence showed he had been in possession and cultivating the land for five years, during the first two of which his fruit trees were injured by frost.

Appeal from a judgment of the superior court for Chelan county, Grimshaw, J., entered November 13, 1919, upon findings and a verdict of a jury in favor of the defendant, upon an affirmative defense and cross-complaint, in an action to reform and foreclose a mortgage. Reversed.

[1]Reported in 197 Pac. 11.

*Hal. H. Cole, Fred Kemp,* and *H. J. Snively,* for appellants.

*Corbin, Whitney & Easton,* for respondent.

HOLCOMB, J.—This is an action originally instituted by the filing of complaint and summons in April, 1918, in the superior court for Chelan county, by Gustave Brandt, as plaintiff, against Benjamin Golden, defendant, to recover $6,800 and interest thereon from January 1, 1916, at seven per cent per annum, evidenced by four promissory notes, and the foreclosure of the mortgage given to secure the same, and for $700 attorney's fees, and costs. Upon the showing made by the defendant that he intended to make an affirmative defense to the cause of action for the rescission of the mortgage and notes, and for other relief, including damages, and that Elizabeth Brandt was a necessary party thereto, the court required the plaintiff to bring in Elizabeth Brandt, his wife, as a party plaintiff, and thereafter an amended complaint and a second amended complaint were filed in the cause, for the recovery of the indebtedness due, and the foreclosure of the mortgage therefor, and to reform the mortgage to correct a mistake in describing the land, which defendant conceded.

On August 28, 1918, defendant filed an answer, which after making various admissions and denials, contained three affirmative defenses, among others demanding a rescission of the instrument sued on, and offering to restore the premises upon the payment to him of certain sums paid out by him during his possession of the real estate, and for damages alleged in the sum of $15,222.81. The affirmative answers were replied to by plaintiffs, containing certain admissions, and denials of most of the allegations of each of the

affirmative answers, and also pleading to each of the affirmative answers that the same had not been commenced within the time provided by law, and therefore could not be sustained.

The court, over the objections of plaintiffs, allowed a jury, and after trial to the jury, the jury returned a general verdict, allowing damages to defendant in the sum of $6,425, and answered twenty-five special interrogatories propounded to them, favorably to defendant.

The trial court did not permit any issue tending to set up a rescission of the instrument sued on by plaintiffs, but required the defendant to elect as to his affirmative defenses. Defendant electing to stand upon the issue of damages under the affirmative defense, for misrepresentation and fraud alleged to have been committed by plaintiffs against him, only those issues were submitted to the jury.

From the evidence it appears that, during the latter part of August or fore part of September, 1913, plaintiffs were the owners of a tract of land in Chelan county, containing 10.86 acres; that this tract was planted to winesaps and spitzenberg apple trees, with pear fillers, which had been planted four or five years; that there was an eight room house upon the premises, and barns and other buildings. On about September 8, 1913, plaintiffs and defendant entered into a written contract whereby plaintiffs agreed to sell, and defendant agreed to buy, for the sum of $12,000, the 10.86 acre tract, and defendant paid thereon the sum of $200 to bind the bargain. In October, 1913, the defendant paid $5,000 additional, and plaintiffs executed a deed of the premises, Golden giving back a mortgage for $6,800 to secure the deferred payments, $800 of which was payable on or before January 1, 1916, and the balance due in yearly payments, with interest at seven per cent per

annum, the last being payable in January, 1918; none
of the interest was due or payable until January, 1916.
In April or May, 1914, defendant went into possession
of the premises and resided thereon continuously up to
the date of the trial, and was then still in possession
thereof. In January, 1916, when the first note and the
first interest payment became due on the first mortgage,
the defendant was unable to meet the same, and plain-
tiffs thereupon threw off all of the interest on the $6,800
indebtedness from the date of the mortgage to January
1, 1916, and the defendant made and executed a new
mortgage and note for $6,800, plus $375 which was
owing by Brandt on a water right, and was then as-
sumed by Golden. The payments were arranged, $375
due March 1, 1917; $500 due March 1, 1918; $1,500 due
March 1, 1919; $2,000 due March 1, 1920, and $2,800 due
March 1, 1921, no interest becoming due and payable
until March, 1918. The first $375 note was paid by
Golden in 1917, after maturity.

Upon the $500 note, and interest on the entire amount
becoming due, in March, 1918, the defendant failing and
refusing to pay any portion thereof, the plaintiffs de-
clared the entire amount due and payable under the
terms of the mortgage and notes, and commenced fore-
closure proceedings for $6,800, with interest at seven
per cent per annum from January 1, 1916, an attorney's
fee of $700, and costs.

The fraud and misrepresentation alleged by defend-
ant in the affirmative answers were in substance that
the plaintiffs and their agents represented that the land
was free from frost; that the trees would produce 1,000
boxes of apples in 1914; 2,000 boxes in 1915; 4,000 boxes
in 1916, and 8,000 boxes in 1917; that a part of the land
which was bench land and side hill from the bench con-
tained only one and one-half acres of land, whereas in

truth and fact it contained 2.46 acres. The land in question is a square tract bounded by metes and bounds and the greater portion of it, outside of a small tract on the western side of it, is level. The tract on the western side, called the bench land, is somewhat irregular in shape, but the top or bench is level and regular, and the slope therefrom to the low land could be easily seen and observed. The defendant made no attempt to ascertain the exact area of the bench land and the side hill until 1917, when he employed an engineer to survey it, and the engineer surveyed the top or bench land, and then estimated the area of the side hill separately, measuring around the side of the hill. The bench land at the time of the sale to Golden was all planted to trees and the side hill was terraced and planted to trees and grapes.

Twenty-eight errors are claimed by appellants, and the briefs take a wide range in argument. We shall deal only with one, however, deeming it decisive of the controversy.

We shall assume the findings and verdict of the jury and of the court, who considered the findings and verdict of the jury as advisory only, as concluding the facts as to the misrepresentations. We are then forced to conclude that the statute of limitations, pleaded by plaintiffs to the affirmative defenses and the counterclaim, should apply.

This counterclaim, and the affirmative defenses were first set up August 28, 1918. Defendant went into possession of the premises in April or May, 1914. He remained continuously in possession until the trial. He alleged and testified that the crops of fruit on the land, from the time he went into possession until the trial, were so injured and damaged by frost that he never had

a full crop; never had anything to approach what he claimed plaintiffs represented he would have the first year, and yet that he never discovered that the failure was on account of frost until 1917, and that he could not have discovered it sooner.

He testified, however, that he was sixty-one years of age; that he came from Russia, where he had been a teacher; that he went first to New York, where he was in business, and then to West Virginia, where he was in business, and came thence to Washington; that he first went to Ellensburg, and examined farm and fruit lands in that locality; that he was desirous of getting a commercial orchard; that he went to Pullman and attended the horticultural school at the Washington State College for a full year, and remained in that school after he had bought the land in question in September, 1913, until April or May, 1914, when he established his residence on the land; that while at Pullman he studied about frost conditions as affecting fruit orchards, and knew something about frost pockets; that he found that a frost pocket meant a depression surrounded by other lands, and that he examined this land, and found that the low land was "partially surrounded"; that it was closed on one side, and partly closed on another, and the first impression he had was that it might be a frost pocket; and he asked the plaintiffs and their selling agents if they did not think it had ever been affected by frost, or if it was not a frost pocket, and they said it had not, and was not; that he repeatedly asked them the same question; that he procured the services of a Mr. Morris, who was the head of the horticultural department of the Washington State College and in whom he had implicit confidence, and with Mr. Morris he made several examinations of the land in question, and of

other lands, comparing them; went over this land thoroughly, had the soil analyzed, paid Mr. Morris for his services, and relied on Mr. Morris' judgment and knowledge. He further testified that, in the spring of 1914, the blossoms formed on the trees and then the frost killed the blooms and they turned brown. In 1915, the same thing happened; that, in 1914 and 1915, he knew his land was affected by frost to some extent; that, in 1916, there was a general failure of fruit crop in that particular locality on account of frost, and that, in 1917, there was a failure on account of frost.

Several of his witnesses testified that, in 1914, it was apparent that his apple trees, as well as other apple trees in that immediate locality, had been affected by frost, and that, in 1915, it was very apparent. Some of the witnesses testified that any one of average intelligence could see, in 1914, that the trees on that land were affected by frost; that it would hardly be possible for a man to live there on the ranch during the years 1914 and 1915 and not notice the frost. It is in evidence that trees of the age of the trees on this land when defendant bought it would not bear to any great extent, but were supposed to come to fairly full bearing about the year that defendant went into possession, or 1914.

We are of the opinion that this case is controlled by our decisions in *Deering v. Holcomb,* 26 Wash. 588, 67 Pac. 240, 561; *Irwin v. Holbrook,* 32 Wash. 349, 73 Pac. 360; *McDonald v. McDougall,* 86 Wash. 339, 150 Pac. 625, and *Hoy v. Burk,* 92 Wash. 536, 159 Pac. 701.

In the last case cited, a suit had been begun for damages for fraudulent representations, by the purchasers of the land in April, 1915, plaintiffs having lived on the land continuously since the early part of 1910. They alleged and testified that it was not until May or June, 1912, that they discovered the fraud per-

petrated upon them by respondents representing that the lands were free from frost, and that a certain drainage system could drain certain portions of the land. This court held that it could be only an "idle assertion" that they did not discover the fraud prior to May or June, 1912. We further said:

"Plaintiffs had a fair chance more than three years before suit to test the soil, and as for the drainage system, they could, even as early as the autumn of 1911, view that installed. It will not do to say that they did not sooner have reasonable opportunity to discover the fraud they complain of, and if they did have reasonable opportunity, they are barred by the interpretation we have long placed upon § 159 of Rem. & Bal. Code, respecting the three-year period after discovery of a fraud. (Citing cases.)

"What was said in the *Holbrook* case may well be said here, that plaintiff was living where these things occurred, had easy access to the sources of information, and was of ordinary intelligence. He had every reason to make investigation promptly, and not a single means of finding out things for himself was withheld from him."

So in this case: Defendant, who set up the affirmative defenses and counterclaim alleging fraud and misrepresentation in August, 1918, was a man of more than ordinary intelligence; he had a highly trained mind, and had been an instructor in a school or college. He had attended a special technical school for the purpose of learning about the culture of fruit, and about the conditions of soil and climate affecting fruit culture. If, as he says, he properly sprayed, pruned and cultivated the fruit trees in each of the years (although appellants controvert this), and he did not obtain the crop that he should have grown on the fruit trees in 1914, with his general and special knowledge concerning the same, he certainly knew, or should have known, in 1914, that the

land was affected by frost, and should have made complaint then. If, however, he had desired to be especially fair, and to give the land another trial for another season to see whether the frost had been merely incidental or unusual in 1914, then in 1915 he would have given it a sufficient trial, and should have made complaint then. Instead of that he remained on the land and in 1916, lulled appellants into further security by executing new notes and a new mortgage in substitution for the original ones. So, also, as to the waste land which he says was one acre more than was represented to him. In 1914 and 1915, he was certainly familiar with every acre of the land bought. If he thought there was more waste land than was represented to him, he should have taken steps to ascertain the same. Instead thereof he continued to cultivate all the land, including the waste land with its trees and vines, and made no complaint up to the time he gave the new notes and mortgage, nor thereafter at any time until he filed his affirmative answer and counterclaim.

Such negligence on the part of defendant to discover and make known the fraud, if any has been perpetrated upon him, more than three years previous to his affirmative action, must be held to amount to discovery of the fraud. *Irwin v. Holbrook, supra.*

We are of the opinion that appellants are entitled to a decree for the amount sued for in their second amended complaint, with interest as prayed, and for attorney's fees and costs.

The trial court, having granted judgment for the difference between the damages awarded defendant and the amount of plaintiff's debt, which amounted to $375, gave judgment therefor, and for $75 attorney's fees. In view of the amount involved herein, and the difficult litigation which has followed appellant's institution of

their foreclosure suit, we are of the opinion that an attorney's fee of $700 should be allowed appellants as prayed in their complaint.

Judgment reversed and remanded with instructions to enter a decree in conformity herewith.

PARKER, C. J., MACKINTOSH, and BRIDGES, JJ., concur.