[No. 23829. Department Two. January 7, 1933.]

YAKIMA FINANCE CORPORATION *et al., Appellants,* v. HORACE S. THOMPSON *et al., Respondents.*[1]

[1]Reported in 17 P. (2d) 908.

*LaBerge, Cheney & Hutcheson,* for appellants.

*J. V. Hoeffler, Short & Short, Rigg, Brown & Halverson,* and *E. E. Wager,* for respondents.

Beals, J.—Defendant Horace S. Thompson, during the month of April, 1930, was, by the superior court for Kittitas county, appointed receiver of Cle Elum Motor Sales Company, an insolvent corporation, which had been engaged in the business of operating a garage. Defendant American Surety Company of New York furnished the receiver's bond. Yakima Finance Corporation and Turner Auto Parts Company were creditors of the Cle Elum Company, the claim of the former company approximating in amount ninety-four per cent of all the claims due. Upon his appointment, the defendant receiver took possession of eighteen used automobiles and other property, including at least three more automobiles, one a wreck, belonging to the insolvent. The receiver retained J. V. Hoeffler, of Cle Elum, and the firm of Rigg, Brown & Halverson, of Yakima, as his attorneys.

Sometime prior to June 5, 1930, one Earl Gallagher offered the receiver, for the eighteen automobiles above referred to and three other used cars, the sum of five thousand dollars. Mr. C. W. Halverson, one of the receiver's attorneys, advised Yakima Finance Corporation (hereinafter referred to as Yakima) of this offer, and was informed that that company objected to any sale for such an amount. Mr. Halverson testified that he advised the receiver of this conversation, and recommended that Mr. Gallagher's bid be rejected, which course was adopted by the receiver.

Later, Mr. Halverson conversed over the telephone with his associate counsel, and stated that, in his opinion, an order of sale should be entered and notice of the sale given pursuant thereto. Mr. Halverson then

informed Yakima that the automobiles would not be sold save upon notice, and that he had requested his associate counsel in Cle Elum to apply to the court for an order of sale of the machines. In his testimony, Mr. Halverson frankly states that he told Yakima that the cars would not be sold without notice, he believing that Mr. Hoeffler had agreed to follow that plan.

June 4, the receiver, through his local counsel, without notice to his attorneys in Yakima, filed a petition for an order of sale of the automobiles, and June 6, the superior court entered an *ex parte* order confirming the sale of the eighteen machines to Mr. Gallagher for the sum of $4,300; the difference between the amount paid for the cars and the prior offer made by Mr. Gallagher being accounted for by the fact that three machines, included in the group for which Mr. Gallagher had made his first offer, were omitted from the list of cars (eighteen in number) for which Mr. Gallagher made his second offer.

Plaintiffs contend that Yakima had stated to Mr. Halverson that it would bid for the eighteen machines the sum of six thousand dollars. As to just what was said in connection with this matter, there is some conflict in the testimony. Undoubtedly, there was talk about the sum of six thousand dollars, but whether this was a positive statement that an unrestricted offer of that sum was or would be made, or whether such an offer on the part of Yakima was contingent upon its ability to use its claim against the insolvent corporation in connection with its bid, the evidence is in conflict. For the purposes of this opinion, we assume that Yakima was willing to bid six thousand dollars for the automobiles, and that Mr. Halverson was so informed.

In any event, the trial court was not advised that Yakima had intimated that it would bid a sum greater than $4,300 for the automobiles which the court ordered

sold. As soon as Yakima learned of the action of the court, an attempt was made to prevent delivery of the cars under the order confirming the sale, but they had already been turned over to the purchaser and were on their way to Seattle. It was evidently deemed inexpedient to endeavor to recover the cars, and no further attempt was made to vacate the sale.

The assets of the insolvent company were wholly insufficient to pay its debts, and this action was instituted by two creditors of the corporation seeking to recover from the receiver and the surety upon his bond the sum of $1,700, being the difference in the amount the receiver accepted for the cars and the sum Yakima alleges it was willing to pay therefor. In their complaint, plaintiffs allege that the receiver, in making the sale to Mr. Gallagher, acted negligently, carelessly and fraudulently, in total disregard of the rights of the creditors of the insolvent corporation, and that the receiver in so proceeding was guilty of misconduct, for which he and his surety should respond to the creditors in damages. Upon the issues being made up, the action was tried to the court, and resulted in judgment in favor of defendants dismissing the action, from which judgment plaintiffs appeal.

Appellants' assignments of error may all be discussed in connection with the question of whether or not the court erred in dismissing the action and in not granting appellants all or a portion of the relief which they claimed.

The order entered by the superior court June 4 provided

" . . . that said receiver sell all said cars for cash in hand at private sale to the highest and best bidder for not less than appraised value thereof."

It is, of course, true that it was the duty of the receiver to obtain the best possible price for the property

of the insolvent, and it is elementary law that a receiver is bound to exercise reasonable care and diligence in the management of his trust, and that he and his surety are responsible in damages to persons who suffer loss because of the failure of the receiver to perform his duty.

In the first place, appellants contend that, as the order directing that the cars be sold at private sale did not direct that the sale be made without notice, and provided that the property be sold "to the highest and best bidder," the order should be construed as requiring a call for bids and the consequent giving to the public of some notice of the sale. In this connection, appellants cite Rem. Rev. Stat., § 582, governing the sales of property "under execution, order of sale or decree," and providing for the giving of notice of such sales.

The general rule is that a receiver's sale shall be conducted in the manner directed by the court, and we are satisfied that the statute relied upon by appellants is not applicable to a sale by a receiver, but that the general rule applies. While a receiver's sale is a judicial sale, it cannot be held that it comes within those classes of sales covered by § 582, *supra,* which very clearly applies to entirely different classes of judicial sales.

The word "receiver" is defined, and the powers of such an officer outlined, by Rem. Rev. Stat., §§ 740 and 743. As to the manner of conducting receiver's sales, the statute is silent, but such a sale, being made by one who is a mere agent of a court of equity, an arm of the court, and not a ministerial officer having well defined statutory duties, comes within the rule laid down in Clark on Receivers (2d ed.), §§ 484 and 514. In the case of *Nisbet v. Great Northern Clay Co.,* 41 Wash. 107, 83 Pac. 15, this court said:

"We know of no statutory requirements regulating the sale of property by receivers in this state which make it necessary to give notice to all the creditors. The sale is made under the direction of the court as a court of equity, and it should be presumed that the court and its officer will make an honest effort to realize the greatest sum possible for the assets of the trust."

This case is cited in 53 C. J. 207, in support of the rule there laid down:

"The court having charge of a receivership may direct what notice of a sale shall be given, and compliance with its order is all that is necessary . . ."

In his petition for an order of sale of the automobiles, respondent receiver prayed "the court to order said automobiles sold to the highest and best bidder for cash in hand, without further notice."

In this opinion, we assume, as above stated, that Yakima was ready, able and willing to bid and pay six thousand dollars for the automobiles in question. That company had made a trust mortgage to another corporation, for the purpose of carrying out a voluntary liquidation (its own trustees, however, being still conducting its business), and the president of the trustee, in a conversation with the receiver and his counsel, had clearly indicated that, in his opinion, as far as the Cle Elum Company was concerned, Yakima was due for a heavy loss, and that the best course to follow was to get rid of the receivership property as soon as possible, speed being of the essence of the matter. This conversation took place before the talk between Mr. Halverson and the secretary of Yakima which resulted in the rejection of the five thousand dollar bid.

As above stated, Mr. Halverson testified that he told the attorney for Yakima that the cars would not be sold without notice. After this conversation, Mr. Hal-

verson phoned Mr. Hoeffler of his talk with Yakima, and supposed that he had made the matter clear to his associate, and that no sale would be made without ample notice to Yakima. We are satisfied that everyone concerned was acting in entire good faith, and the regrettable situation here presented is one of the many cases which arise because of misunderstandings of the spoken word. Mr. Halverson naturally supposed that his associate counsel understood the situation, and that the course which he (Halverson) had outlined would be followed. It does not appear that this particular phase of the situation, upon which the whole matter turns, was drawn to the personal attention of the receiver.

There is nothing in the record which indicates to the least degree collusion between the receiver and Mr. Gallagher. The record shows that, upon his appointment, the receiver had caused the property of the trust to be appraised, and had advertised the same for sale in the local newspaper, had distributed handbills advertising the sale, and placed upon each several car a price tag. Unfortunately, he sold not a single car, but it would appear that his advertising campaign reached as far as Seattle, as Mr. Gallagher in that city learned of the fact that the receiver was endeavoring to sell some second-hand automobiles, and made an investigation which resulted in his offer.

Upon presentation of the receiver's petition to the court on June 4, the receiver stated that he had previously rejected a five thousand dollar bid, for the reason that Yakima objected to a sale for less than six thousand dollars. The court, before acting upon the receiver's petition, on its own motion appointed three appraisers, who valued the cars, appraising each one separately, in the sum of $4,314, and appraised them as a unit for the purpose of a lump sale for cash in the

sum of $3,882.60. Mr. Gallagher's bid being a cash offer for all eighteen cars, the court, June 6, made an order confirming the sale to Mr. Gallagher.

The testimony offered on behalf of appellants as to the value of the cars is not particularly satisfactory. One witness, testifying for appellants, stated that the cars were worth seven thousand dollars. This witness was not an experienced automobile mechanic, but had been employed by Yakima as a collector and, incidentally, as an appraiser of cars for the purpose of making loans. During the month of May, the witness spent a couple of hours or so examining the cars; just how many machines he looked at, he did not remember. The three men whom the court appointed appraisers testified as to the value of the cars, and their testimony as to value is much more convincing than that introduced on behalf of appellant. These men were well qualified to appraise the cars, and were apparently entirely disinterested witnesses. The court, therefore, in confirming the sale to Mr. Gallagher, was justified in believing that the trust estate was receiving the fair value of its property. We are convinced that the evidence preponderates in favor of this conclusion.

The question, then, is: Can the receiver be held in damages as for neglect of duty or fraud because he might have sold the cars to another party for a sum greater than that which he received and which probably exceeded the reasonable market value of the automobiles?

In this connection, we are, of course, fully aware of the fact that it is very difficult to determine the market value of used automobiles, and even harder to decide at what price such property could have been sold. The receiver cannot be held personally liable to a creditor for an honest mistake in the reasonable exercise of his best judgment. He can be held liable only for careless

or negligent conduct or for acts based upon bad faith or fraud. It is not suggested that the receiver had any ulterior motive in selling the cars to Mr. Gallagher, or that he, at any time, desired to do anything save that which would result in the greatest advantage to the trust which the court had committed to his charge.

Appellants argue that notice to one of the receiver's counsel of the fact that Yakima would bid six thousand dollars for the automobiles must, in law, be held to be notice to the receiver; but, under the circumstances of this case, we cannot hold that such is the law, and that a receiver must respond in damages because he followed such a course as is above outlined when one of his attorneys in another city had information to the effect that another course might result in greater profit to the receivership.

It must be remembered that this is not an action to vacate a receiver's sale, but is a suit against the receiver to subject him to liability for official misconduct or neglect of duty. Appellants contend that it must be held, as matter of law, that notice to Mr. Halverson of the fact that Yakima would bid six thousand dollars for the eighteen cars was notice to the receiver.

The authorities cited by appellants in this connection do not support the proposition which they advance. In the case of *Deering v. Holcomb,* 26 Wash. 588, 67 Pac. 240, 561, it was held that knowledge by plaintiff's counsel of facts sufficient to put an interested party on inquiry as to fraud, constituted notice both to client and attorney sufficient to start the running of the statute of limitations. In the later case of *Schmidt v. Olympia Light & Power Co.,* 46 Wash. 360, 90 Pac. 212, knowledge on the part of an attorney, suppressed by him, was imputed to a client, who later purchased certain rights which were seriously affected by the knowledge possessed by the attorney. Questions which were

determined by this court in the two cases cited are so utterly different from those now before us that the cases are not here in point.

The same is true of the case of *Stubbe v. Stangler,* 157 Wash. 283, 288 Pac. 916, in which it was held that a vendee of real estate was chargeable with knowledge gained by his attorney, who had examined the abstract of title to the real estate in question. This principle is, of course, sound. The attorney was retained to examine the particular abstract in question, and knowledge which he gained by such an examination must necessarily be imputed to his client.

Under the circumstances now before us, we are satisfied that the receiver cannot be held responsible in damages for failure to take into consideration information which had been conveyed to one of his counsel and concerning which the receiver knew nothing.

Examination of the record convinces us that appellants failed to make a case which requires the entry of judgment against respondents, and the judgment of the trial court dismissing the action is accordingly affirmed.

TOLMAN, C. J., STEINERT, and MAIN, JJ., concur.