**In re SUNDANCE CORPORATION, INC., a North Dakota Corporation, Debtor.**

**Bankruptcy No. 88–01246–R41.**

United States Bankruptcy Court, E.D. Washington.

Jan. 13, 1993.

Michael A. Arch, James Drewelow, Wenatchee, WA, for Scott Property Management.

Andrew Salter, Seattle, WA, for Pacific First Bank.

Keith Trefry, Spokane, WA, for Holeman Group.

## MEMORANDUM OPINION

JOHN A. ROSSMEISSL, Bankruptcy Judge:

## JURISDICTION

This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(a) (the district courts shall have original and exclusive jurisdiction of all cases under Title 11) and 28 U.S.C. § 157(a) (authorizing the district courts to refer all Title 11 cases and proceedings to the bankruptcy judges for the district). This matter is a core proceeding under 28 U.S.C. Section 157(b)(2)(B) and (O).

## FACTS

On January 30, 1985, Community First Federal Savings and Loan ("Community"), filed a state court complaint to foreclose a mortgage on a fruit orchard of approximately 2,000 acres situated in Grant County, Washington (the "Orchard") owned by the Sundance Corporation ("Debtor"). H.V. Holeman and Holeman Limited Partnership (collectively, "Holeman") own the stock of the Debtor. Concurrently, Community sought appointment of a state court receiver and authority to expend funds necessary for the protection and preservation of the Orchard.

On February 7, 1985, Community and Holeman stipulated to an order (the "Order") appointing Scott Property Management, Inc. ("SPM") as receiver. The Order also authorized Community to disburse funds to SPM for the "operation and maintenance" of the Orchard, authorized SPM to take "the necessary action and expend the necessary funds to prune and spread the Orchard", and required SPM post a $125,000.00 bond.

On February 11, 1985, SPM filed an affidavit incorporating a proposed budget for the operation of the Orchard during the remainder of the 1985 crop year, including an inspection report dated September 18 and 19, 1984 that recommended the Orchard's trees be staked.[1]

On March 25, 1985, SPM moved to amend the Order by adopting a budget for the Orchard for February 1, 1985 through January 31, 1986 which detailed expenditures necessary to maintain and preserve the Orchard according to prevalent horticultural practices and standards in Grant County. The state court approved SPM's motion

---

1. The report stated that, "[s]taking must be completed in early 1985.... Many trees are already blown to an angle of 60–70 degrees. Windward limbs are blown to near vertical growth."

(the "Amended Order") and extended the receivership through January 31, 1986. The Amended Order provided that Community would fund material and labor necessary to stake the Orchard.

Staking the Orchard was necessary to prevent wind damage, and entailed using wooden stakes to support the apple trees. SPM treated one end of each stake with a mixture of pentachlorophenol and diesel fuel (the "Dip") to prevent its deterioration. The mixing of the Dip was done according to the pentachlorophenol's label instructions, and applied by filling 55 gallon drums with a few inches of the Dip. The stakes were tightly packed in the drums, bundled standing upright, and soaked in the Dip for approximately 24 hours. Each bundle was then removed by a forklift and would be held over its barrel for approximately 30–60 seconds to allow excess Dip to drain off. Approximately 300,000 stakes were treated with the Dip through the end of 1986. Some minor treatment occurred thereafter.

Additionally, SPM used various pesticides at the Orchard.[2] The pesticides were mixed with water at various locations around the Orchard (the "Fill Stations") and were used on the Orchard to preserve, maintain, and commercially operate it. At all times, SPM's use and application of pesticides was in good faith and in accordance with prevailing horticultural practices and standards in Grant County. Additionally, Community was generally aware that SPM was using the pesticides at the Orchard, and approved and reimbursed SPM's expenditures incurred for their use.

For the year ended January 31, 1986, SPM moved for approval of its' 1985 receivership report and for extension of the receivership through 1986. The state court approved SPM's annual report for 1985 and extended the receivership till December 31, 1986.

Thereafter, the state court again approved SPM's report on operations for 1986

and extended the receivership through 1987.

On February 26, 1988, Debtor filed a petition in Montana for relief under Chapter 11 of the Bankruptcy Code (the "Code"). On March 2, 1988, Community moved for an order to excuse SPM from having to turn over the Orchard to Debtor, and SPM filed a similar motion shortly afterwards. The Montana bankruptcy court excused SPM from turning over the Orchard, finding that SPM had ably performed its duties as receiver.[3] On April 6, 1988, Debtor's case was transferred to the Eastern District of Washington, and on March 20, 1989 this court confirmed Debtor's Plan. The Plan provided for the Orchard, equipment, and 1988 apple crop proceeds to be transferred to Pacific Bank, ("Pacific") the successor-in-interest to the claims of Community. Pacific was to pay $2,500,000 to Debtor upon completion of said transfer, and all of Pacific's claims were to be deemed satisfied. Holeman also agreed with Pacific to split the anticipated clean-up costs for hazardous materials released at the Orchard reasonably necessary to bring the property into minimal compliance with federal and state laws and regulations.

Tests of soil samples found pentachlorophenol in the stake treatment area, and also found that the soil at three of the Fill Stations contained varying levels of Elgatol, Envy, Guthion, Paraquat, Parathion, Princep, Surflan, Systox–6, Penoxalin, and Cholopyrifos. The soil at the stake treatment area and several of the Fill Stations was visibly stained.

Pursuant to the Plan, the real and personal property at the Orchard was transferred to Pacific's management company. On April 9, 1990, SPM filed a motion under § 543(b)(2) for approval of an accounting, termination and discharge of its custodianship, and exoneration of the receivership bond. SPM was in actual possession and control of the Orchard as a receiver or

---

**2.** The pesticides used include: Elgatol, Envy (2, 4–D), Guthion, Paraquat, Parathion, Princep, Surflan, and Systox–6.

**3.** *In re Sundance Corp.*, 83 B.R. 746, 749 (Bankr. D.Mont.1988).

custodian from February 7, 1985, to approximately June 1, 1989.

Holeman and Pacific objected to SPM's motion, asserting that SPM was liable for cleanup costs in connection with the release of hazardous substances at the Orchard. SPM then amended its motion to also request the payment of attorney fees and costs. Pacific and Holeman again opposed this amended motion.

The parties agreed to bifurcate the legal issues regarding SPM's liability for environmental cleanup from the damages issue. Pacific and Holeman filed separate motions for partial summary judgment on SPM's liability for the cleanup costs. SPM filed a cross-motion for summary judgment on all claims against it by Pacific and Holeman. After a hearing on the motions for summary judgment, the court took the matter under submission.

## DISCUSSION

Pacific and Holeman assert that SPM's activities regarding the use of the chemicals were abnormally dangerous, and that SPM is strictly liable for clean-up costs under the common law, the statutory strict liability provisions of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), and Washington state's Model Toxics Control Act ("MTCA") and Hazardous Waste Management Act ("HWMA"). SPM's cross-motion for summary judgment asserts primarily that, because its conduct in managing the Orchard was done pursuant to orders of a state court or bankruptcy judge, the doctrine of derivative judicial immunity immunizes it from liability for clean-up cost claims based upon common law, CERCLA, MTCA, or HWMA. Additionally, SPM implicitly raises the issue of whether its acts as receiver are beyond review since they have already been approved by order of the appointing state court. Thus, resolution of this case first requires a preliminary determination of whether this court has jurisdiction to review SPM's performance prior to the bankruptcy. If SPM's performance

during the state court receivership is reviewable, then this court will have to consider the scope of a receiver's immunity from strict liability for court authorized performance of abnormally dangerous activities, and whether CERCLA, the MTCA, or the HWMA have abrogated the derivative judicial immunity that a receiver may possess under the common law.

## I. JURISDICTION TO REVIEW THE RECEIVER'S PERFORMANCE.

■ The orders approving SPM's operating plan, budget and interim accountings are interlocutory orders incident to the administration of the estate and subject to correction upon the receiver's final accounting. *Pacific Coast Coal Co. v. Esay*, 92 Wash. 203, 207; 158 Pac. 1003 (1916). Thus, those orders may be subject to review.

The staking activity which constitutes the major gravamen of Pacific and Holeman's case took place in 1985 and 1986. The majority of SPM's actions took place prior to the bankruptcy and most of the damages complained of occurred during the state court receivership as opposed to the bankruptcy court custodianship. Pacific and Holeman's complaints require that this court review SPM's performance prior to the bankruptcy as well as its performance as bankruptcy custodian. Review of SPM's performance as a receiver raises the issue of whether this court has jurisdiction, as a non-appointing court, to review that performance.

From the earliest days of our state's jurisprudence, consent by the appointing court has been a necessary predicate to actions against a receiver. In *Brown v. Rauch*, 1 Wash. 497, 20 Pac. 785 (1889), the territorial supreme court, relying upon the Supreme Court's decision in *Barton v. Barbour*, 104 U.S. 126, 26 L.Ed. 672 (1881), ruled that consent of the appointing court was a jurisdictional prerequisite for a suit against a receiver in his official capacity.[4] 1 Wash. at 500, 20 Pac. 785.

---

**4.** *See also, Merryweather v. United States,* 12 F.2d 407, 409 (9th Cir.1926) (consent of the appointing court held to be a jurisdictional requirement prior to suit against a receiver).

The rationales for this rule are summarized in *Brown:*

> The receiver is appointed upon a principle of justice, for the benefit of all concerned.... He is virtually a representative of the court, and of all the parties in interest in the litigation wherein he is appointed.... Money or property in his hands is *in custodia legis.* He has only such power and authority as are given him by the court, and must not exceed the prescribed limits. The court will not allow him to be sued touching the property in his charge, nor for any malfeasance as to the parties, or others, without its consent; nor will it permit his possession to be disturbed by force, nor violence to be offered to his person while in the discharge of his official duties.

1 Wash. at 499, 20 Pac. 785 (citation omitted).

■ This rule fosters judicial economy and administrative efficiency by protecting the property of the estate and a court's duly appointed officers from interference. Who better can determine if a receiver acted beyond the scope of its authority than the court that granted that authority?

■ This court did not appoint SPM as receiver and there is no indication that the Grant County Superior Court has granted leave to this court to litigate these matters. Although SPM did not raise this issue it can not be waived and can be raised at any time. *Brown v. Rauch,* 1 Wash. at 500, 20 Pac. 785.

■ However, as a state court appointed receiver at the time the bankruptcy was filed, SPM is a "custodian" under Code § 101(11).[5] Upon the filing of a bankruptcy, a state court receiver generally may not make disbursements[6], and must turn over the property to the bankruptcy trustee and account to the bankruptcy court for the property which came into its possession.[7] Here, SPM was permitted to continue in possession, custody and control of the property under the supervision of this court. 11 U.S.C. 543(d). SPM now seeks approval of the performance of its pre-bankruptcy duties, its post-bankruptcy duties, approval of its fees and discharge of its bond.

■ This court's jurisdiction to review the actions and accounting of a state court receiver is found in § 543(c).[8] Through

---

5. (11) "custodian" means—
 (A) receiver or trustee of any property of the debtor, appointed in a case or proceeding not under this title;
 (B) assignee under a general assignment for the benefit of the debtor's creditors; or
 (C) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of a general administration of such property for the benefit of the debtor's creditors;

6. Section 543(a) provides:
 A custodian with knowledge of the commencement of a case under this title concerning the debtor may not make any disbursement from, or take any action in the administration of, property of the debtor, proceeds, product, offspring, rents or profits or such property, or property of the estate, in the possession, custody, or control of such custodian, except such action as is necessary to preserve such property.

7. Section § 543(b) provides:
 (b) A custodian shall—
 (1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and
 (2) file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian.

8. Section 543(c) provides:
 (c) The court, after notice and a hearing, shall—
 (1) protect all entities to which a custodian has become obligated with respect to such property or proceeds, product, offspring, rents, profits of such property;
 (2) provide for payment of reasonable compensation for services rendered and costs and expenses incurred by such custodian; and
 (3) surcharge such custodian, other than an assignee for the benefit of the debtor's creditors that was appointed or took possession more than 120 days before the date of filing of the petition, for any improper or excessive disbursement, other than a disbursement that has been made in accordance with applicable law or that has been approved, after notice and a hearing, by a court of competent juris-

§ 543, Congress has apparently authorized bankruptcy courts to review and conclude matters relating to a state court receivership. Since receivership property becomes property of a bankruptcy estate upon the filing of a petition, control and decisions affecting the receivership assets which were formerly *in custodia legis* of the state court come under and become the domain of the bankruptcy court. Through § 543(c) and § 503(b)(3)(E) [9] Congress gave the bankruptcy courts power to decide all issues concerning charges against that property. Thus, the objective in *Brown* of protecting a court's control of property being administered is preserved.

The second objective of reserving jurisdiction to review a court officer's acts in the appointing court is not so easily honored by § 543. On its face, § 543 does not give *carte blanche* to a bankruptcy court to review the orders of the receivership court, even if those orders might be interlocutory, nor is § 543 explicit regarding whether a receiver can be surcharged by the bankruptcy court for improper actions taken pursuant to the appointing court's order, but not involving disbursement. [10]

■ But, since Congress gave bankruptcy courts the power to pay a receiver's expenses, costs and compensation in § 503(b)(3)(E), it would be impossible to perform the tasks of determining reasonable compensation if a bankruptcy judge could not review the quality of a receiver's performance. Although the duty to review a receiver's performance might have best been delegated to the appointing court, Congress chose to confer those powers on the bankruptcy courts. Accordingly, pursuant to § 543(c) and § 503(b)(3)(E), this court has jurisdiction to review and, if necessary, surcharge SPM regarding the performance of its state court duties.

## II. PERSONAL LIABILITY OF A RECEIVER OR TRUSTEE FOR TORTS UNDER COMMON LAW.

Pacific and Holeman claim that SPM is personally liable for damages arising from the treatment of stakes and release of hazardous materials. Their complaints are in the nature of tort actions against SPM. Therefore, this analysis begins with a review of the rules relating to personal liability of court appointed receivers/trustees for torts. [11]

Generally, there are two classes of claimants to whom receivers or trustees might incur personal tort liability. The first class of claimants are those whose cause of action is independent of any interest in the receivership itself. Pacific and Holeman assert that SPM is personally liable to them because the ground contamination caused by the spilling of the Dip and pesticides damaged their interest in the Orchard. These claims are independent of any interest they might have in the receivership and could be asserted by one with no interest in the receivership at all. The other class of claimants are those who have an interest in the receivership itself. Their claims arise when a receiver breaches its fiduciary duties by mismanaging the receivership. Pacific and Holeman also assert that SPM breached its fiduciary duties by mismanaging the receivership's affairs and is thus personally liable to the estate. These two different grounds for establishing personal liability of a receiver or trustee will be treated separately.

---

diction before the commencement of the case under this title.

**9.** Section 503(b)(3)(E) provides:

After notice and a hearing, there shall be allowed administrative expenses ... including—

. . . . .

(3) the actual, necessary expenses, ... incurred by— ...

(E) a custodian superseded under section 543 of this title, and compensation for the services of such custodian; ...

**10.** 11 U.S.C. 543(c) appears to protect the custodian from surcharge for an improper disbursement if it was made pursuant to a properly noticed court order.

**11.** The Court has been greatly assisted in this task by E. Allan Tiller's excellent article *Personal Liability of Trustees and Receivers in Bankruptcy,* 53 Am.Bankr.L.J. 75 (1979). Although the focus of the article is on the liability of bankruptcy officers, Tiller recognizes that the rules governing liability of state court receivers are essentially the same.

A. *Liability to Parties Disinterested in the Receivership.*

Pacific and Holeman initially argue that SPM is personally liable to them because treating the stakes and using pesticides were abnormally dangerous activities which damaged the Orchard in which they held an interest.

SPM responds that it is immune from personal liability because it was acting within the scope of its authority as receiver or custodian; as an officer of the appointing courts it was merely an agent of those courts and is entitled to the same immunity that a judge would have if she or he had done the complained of acts. In support, SPM relies on *Lonneker Farms, Inc. v. Klobucher*, 804 F.2d 1096, 1097 (9th Cir. 1986) where the Ninth Circuit held that a bankruptcy judge is immune from liability for acts that "were judicial in nature and ... not done in clear absence of all jurisdiction", and that a bankruptcy trustee "or an official acting under the authority of the bankruptcy judge, is entitled to derived judicial immunity because he is performing an integral part of the judicial process."

*Lonneker Farms* follows a well-settled rule first announced by the Supreme Court in *McNulta v. Lockridge*, 141 U.S. 327, 332, 12 S.Ct. 11, 13, 35 L.Ed. 796 (1891) that,

[a]ctions against the receiver are in law actions against the receivership or the funds in the hands of the receiver, and his contracts, misfeasances, negligences, and liabilities are official, and not personal, and judgments against him as receiver are payable only from the funds in his hands.

However, a receiver or trustee is not completely immune from personal liability under the *McNulta* rule. As Tiller states in his article:

Rather than guaranteeing immunity from personal liability, the *McNulta* rule restricts the situations in which personal liability will result. In regards to tort

liability, *McNulta* has been interpreted to prescribe strictly official liability when a third person is injured by a receiver "acting within the scope of his authority" but the receiver is personally liable for torts "personally committed by him."

53 Am.Jur.L.J. at 81 (footnotes omitted).

Applying this rule to the facts here, treating the stakes and using pesticides at the Orchard were within the scope of SPM's authority. Both the state and bankruptcy courts were advised that the trees would be staked and pesticides would be used, and approved budgets that authorized funding.

■■■■ The court now turns to the exception to the *McNulta* rule. Did the receiver personally commit the tort? Liability to parties injured by a receiver's own negligent or deliberate acts is premised on the receiver's personal wrongdoing. A corporate receiver would be personally liable for the torts of its employees. 53 Am.Bankr. L.J. at 81, n. 28. Here, SPM is a corporation and the acts of its employees resulted in the alleged tort.

■■■■ A receiver would be liable personally if it willfully and deliberately breached a duty. *Mosser v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951). In the Ninth Circuit, a trustee is also personally liable for its negligence. *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1357 (9th Cir.1983).[12]

Here, SPM and its employees did not intentionally, willfully, or deliberately spill the Dip or pesticides, nor do they appear to have been negligent in the conduct of their activities. The parties agreed that SPM's acts were in good faith and in accordance with prevailing horticultural practices and standards in Grant county. There has been no showing that those practices and standards are negligent. Rather, Pacific and Holeman argue that SPM's engaging in

---

12. The Ninth Circuit held that:

Although a trustee is not liable in any manner for mistakes in judgment where discretion is allowed, he is subject to personal liability for not only intentional but also negligent violations of duties imposed upon him by law.

703 F.2d at 1357.

*But see, In re Chicago Pacific Corp.*, 773 F.2d 909, 915 (7th Cir.1985) "A trustee may be held personally liable only for a willful and deliberate violation of his fiduciary duties."

unreasonably dangerous activities make SPM strictly liable for the damages that result from those activities without regard to proof of wrongdoing.

▋ While a receivership estate would be strictly liable for damages resulting from abnormally dangerous activities,[13] whether receivers or trustees personally are strictly liable for acts done in the course of their official duties is apparently, and surprisingly, a matter of first impression.

Pacific and Holeman ask that SPM be held strictly liable for damages resulting from acts authorized by the appointing courts, financed by Community, and done with the Holeman's knowledge and acquiescence. Both Community and Holeman recognized the need to stake the Orchard and to apply pesticides as acts essential to the proper management of the Orchard, and both were silent when the budgets were submitted by SPM for review; yet now they seek to shift the cost of these activities to SPM without a showing of wrongdoing.

▋ The court rejects their argument. There is no specific case law supporting it, and the policy considerations surrounding the ability of the court to find persons willing to serve as receivers dictate against such a conclusion.

▋ The argument that a receiver or trustee should be strictly liable for acts done within the scope of their judicial authority is similar to arguments that the commission of torts or violations of law are *per se* outside the scope of a receiver's authority.[14] However, this argument was rejected by the Wisconsin Supreme Court in *State of Wisconsin v. Better Brite Plates, Inc.*, 168 Wis.2d 363, 483 N.W.2d 574, 582 (1992). The court in *Better Brite* concluded that a violation of state law may not necessarily be outside the scope of a receiver's authority. *Id.* 483 N.W.2d at 582. In *Better Brite*, a Wisconsin statute

prohibited the storage of hazardous waste for a period in excess of ninety days without a permit. *Id.* at 576, n. 3. The bankruptcy trustee violated the state law and the state sought to hold the trustee personally liable. *Id.* at 577. Because the bankruptcy estate had only a few hundred dollars of unencumbered assets to finance compliance, the trustee was unable to remedy the environmental problems. *Id.* After considering these facts the court reasoned that,

holding trustees personally liable in situations such as this may well cause potential trustees to decline to operate bankrupt businesses that have environmental problems. The court of appeals noted the "potential devastating impact" that such a holding would have on the pool of persons willing to serve as trustees. We find such public policy considerations compelling. Matters involving the complex legal area of environmental and bankruptcy law depend on the involvement of skilled trustees.

*Id.* at 583 (citation omitted).

▋ This court finds the *Better Brite* policy analysis against *per se* liability for trustees equally applicable to common law arguments seeking to impose strict liability. Use of dangerous chemicals are an integral part of the ordinary farming operation. A receiver's decision to continue the use of such substances in the farm operation should not, absent a negligent or deliberate wrongful act, ordinarily expose the receiver to personal liability. If a receiver was personally liable for any damage that results from an abnormally dangerous activity despite the lack of any showing of a negligent or knowingly wrongful act, courts would be unable to obtain the services of a receiver for any site where abnormally dangerous acts are a routine part of a business. The circumstances which commonly justify the appointment of a receiver for such an operation usually require the immediate services of a responsible, skilled, and knowledgeable person to act for the

---

13. *Great Northern Railway Co. v. Oakley*, 135 Wash. 279, 237 Pac. 990 (1925): *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968).

14. Tiller, 53 Am.Bankr.L.J. at 82–83.

court in protecting the public interest. To reward a receiver's willingness to act for the public benefit with personal liability in the absence of any intentional or negligent wrongdoing would be counter-productive. Thus, SPM is not personally liable to the bankruptcy estate for simply engaging in abnormally dangerous activities within the scope of its authority.

However, the conclusion that SPM is not strictly liable for authorized abnormally dangerous acts does not resolve whether SPM is liable for damages resulting from treating the stakes and applying pesticides to the Orchard. Said treatment and use of pesticides may still constitute negligence by SPM. SPM argues that it is protected from those allegations because of derivative judiciary immunity and relies on *New Alaska Development Corp. v. Guetschow,* 869 F.2d 1298 (9th Cir.1989) in support of its position.

*New Alaska* involved a divorce proceeding in Alaska state court. The judge appointed a receiver for a closely held corporation controlled by the husband. *Id.* at 1299. The husband and the corporation instituted suit against the judge and the receiver asserting state law violations and federal civil rights violations. Additionally, the complaint against the receiver alleged negligence and malpractice in handling the affairs of the state court receivership, as well as theft and slander. *Id.* at 1300. The court found that absolute judicial immunity was appropriate for a "receiver appointed by a state court to manage the business assets of a marital estate during a dissolution proceeding." *Id.* at 1303. That immunity does not prohibit challenge to the receiver's management of the receivership, rather such challenge should be made in the appointing court. *Id.* at 1304. The *New Alaska* court however refused to extend the immunity defense to the theft and slander causes of action because it couldn't find that theft and slander constituted judicial acts. *Id.*

*New Alaska* does not hold that a receiver's acts are absolutely immune. Rather, it generally follows the rule of *Barton v. Barbour* that, while actions to determine personal liability of a receiver for acts that are clearly outside the scope of authority may be heard by a non-appointing court, actions to determine personal liability of a receiver for activities apparently within the scope of its authority must be brought in the court managing the receivership. In the later instance, the receivership court must decide whether derivative judicial immunity protects the receiver personally. This same rule controlled in *Better Brite* where the court held that a non-appointing state court was without jurisdiction to decide whether bankruptcy trustees are personally liable for actions taken within the scope of in their official authority. 483 N.W.2d at 574.

 As previously discussed, this court has the jurisdiction to decide these matters as successor of the appointing court. If this court finds that SPM's specific actions were authorized by order of a fully informed court, then SPM's personal liability will be barred by the doctrine of derivative judicial immunity. *See, e.g., Bennett v. Williams,* 892 F.2d 822, 823 (9th Cir.1989). This process requires an examination of what information was provided to the appointing court when it issued its order. The record before the court is incomplete on this issue, thus this court cannot rule as a matter of law that SPM is protected from personal liability as a result of derivative judicial immunity.

B. *A Receiver or Custodians' Liability to the Estate.*

 A receiver may be liable to an estate for failure of its stewardship, and if the estate is harmed the receiver may be surcharged. A receiver must account for its stewardship of the receivership assets. Pacific and Holeman seek to surcharge SPM for failure to faithfully discharge its duties.

"A receiver is a person appointed by a court ... to take charge of property during the pendency of a civil action ... and to manage and dispose of it as the court ... may direct." Wash.Rev.Code. ("RCW")

§ 7.60.010.[15] Washington statute RCW § 7.60.040 specifies the powers of a receiver,[16] while RCW § 7.60.030 requires that a receiver take an oath and provide a bond.[17]

 The receiver's obligations are that of an officer of the court and its responsibilities are primarily to that court. Failure to properly perform its duties results in liability to the estate.

The standard applied to a receiver's performance of its duties was enunciated in *Yakima Finance Corporation v. Thompson*, 171 Wash. 309, 17 P.2d 908 (1933): "it is elementary law that a receiver is bound to exercise reasonable care and diligence in the management of his trust, and that he and his surety are responsible in damages to persons who suffer loss because of the failure of the receiver to perform his duty." 171 Wash. at 313, 17 P.2d 908. The court added that, "[t]he receiver cannot be held personally liable to a creditor for an honest mistake in the reasonable exercise of his best judgment. He can be held liable only for careless or negligent conduct or for acts based upon bad faith or fraud."[18] *Id.* at 316–17, 17 P.2d 908.

 When a receiver accepts appointment to its office, it undertakes duties to the court and to the estate. These duties are personal and supported by a surety. Derivative judicial immunity does not immunize a receiver for breach of these duties. Normally, a receiver must account personally to its appointing court for the performance of its duties and compliance with the appointing court's orders. However, to the extent that a receiver has merely performed actions which the court ordered it to take, a receiver should be immunized from liability to the estate. If a receiver's task is simply to implement the court's decisions and orders, derivative judicial immunity would be of great comfort to SPM.

 The strength of a receiver's argument for immunity based on compliance with a court's order depends upon the totality of circumstances in which an order is drawn. An order's immunizing power varies with the extent that a court is fully informed as to the nature of the options available for its consideration, and that notice and opportunity is given to interested parties to participate in the decision-making process. *See, Bennett*, 892 F.2d at 823. An order which is the result of such a process will provide much more protection than one which is the product of a receiver's mere suggestion. If the court and the interested parties are fully advised of the risks and options available to a receiver, given an opportunity to state their views on the proposed action, and the court's order then adopts the receiver's proposal, it would be difficult indeed to fault a receiver for following that order. To the extent an order is born of such a fully informed process, a receiver may justifiably assert derivative judicial immunity based upon the order. But if a receiver did not analyze the risks inherent in the various known options and bring the risks to the attention of the court and the parties for their consideration in the decision making process, then

15. The Washington courts elaborated on a receiver's role. *See, Cole v. Washington Motion Picture Corp.*, 112 Wash. 548, 553, 192 Pac. 972 (1920) (a receiver is an "arm of the court.... [H]e ... represents the creditors ... in the same sense and to the same degree that the court appointing him represents them."); *Suleiman v. Lasher*, 48 Wash.App. 373, 378, 739 P.2d 712 (1987) ("a receiver is not the exclusive agent or representative of either party to the suit in which he is appointed, and the receiver is not appointed for the benefit of any party....")

16. RCW § 7.60.040 provides: "[t]he receiver shall have power, under control of the court, to bring and defend actions, to take and keep possession of the property, to receive rents, collect debts, and generally to do such acts respecting the property, as the court may authorize."

17. RCW § 7.60.030 provides:
Before entering upon his duties, the receiver must be sworn to perform them faithfully, and with one or more sureties, approved by the court, execute a bond to such person as the court may direct, conditioned that he will faithfully discharge the duties of receiver in the action, and obey the orders of the court therein.

18. *See also, Bennett v. Williams*, 892 F.2d at 824 (holding that bankruptcy trustees shall not be held liable for mistakes within reasonable business judgment).

the court order will not provide immunity and a receiver will have to defend itself on the merits of whether it acted with reasonable business judgment.

 Here, the state court authorized the on site treatment and use of pesticides, at least generally. SPM submitted a plan and budgets for these activities in advance of their being undertaken and the state court approved SPM's annual accounting for the years in which these activities were conducted. However, SPM's duties also involved the analysis and formulation of the plan to manage the Orchard, and SPM evidently suggested that the best way to meet the Orchard's need for staking was on site treatment. The record does not provide a sufficient factual basis upon which to rule in favor of either party on the basis of approval of SPM's action by the state court. It is unclear whether the state court and Community and Holeman were advised of the inherent risks of on site treatment versus using pre-treated stakes. Without further evidence, the court can not rule as a matter of law, that SPM is absolutely immune because it was simply following the state court's orders.

 Absent immunity based upon the state court's orders, this court must decide whether treating the stakes was within the range of SPM's reasonable business judgment. If SPM's recommendation of on site treatment was so erroneous as to be outside the spectrum of reasonable business judgment then the state court's authorization of on site treatment and subsequent approval of reports and budgets will not immunize SPM.

The evidence on SPM's business judgment is inconclusive. The record is insufficient for this court to pass judgment on the reasonableness of SPM's treatment decision. Testimony indicates that the cost of pre-treated stakes was prohibitive. Whether that cost exceeded the projected clean-up cost is unknown. In any event, the factors considered in SPM's treatment decision have not been satisfactorily developed, and as a result, summary judgment can not be granted on the common law claims.

## III. RECEIVER/CUSTODIAN LIABILITY UNDER CERCLA.

Up to this point, the court has considered Pacific and Holeman's common law claims. They also claim that SPM is personally liable under CERCLA, which allows persons who have incurred environmental clean-up costs to recover these costs from others who are liable. CERCLA § 9607 provides:

> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> . . . .
>
> from which there is a release ... which causes the incurrence of response costs, ... shall be liable for
>
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan. . . .

Pacific and Holeman argue that SPM is either an "owner or operator"[19] under § 9607(a)(1) or a person who operated a facility[20] at the time of a release of a hazardous substance pursuant to § 9607(a)(2).

Here, the Orchard constitutes an onshore facility and SPM's conduct of farming operations make it an operator of that facility.

CERCLA also contains a number of exceptions to the definition of "owner or operator," the most significant one here being § 9601(20)'s exemption arising from certain governmental activities:

> (D) The term "owner or operator" does not include a unit of State or local government which acquired ownership or

---

**19.** The general definition is in CERCLA § 9601(20)(A) which states: "[t]he term "owner or operator" means ... (ii) in the case of an onshore facility ... any person owning or operating such a facility...."

**20.** A "facility" is defined in CERCLA § 9601(9) as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise came to be located...."

control involuntarily through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government involuntarily acquires title by virtue of it function as sovereign. The exclusion provided under this paragraph shall not apply to any State or local government which has caused or contributed to the release or threatened release of a hazardous substance from the facility, and such a State or local government shall be subject to the provisions of this Act in the same manner and to the same extent, both procedurally and substantively, as a any nongovernmental entity, including liability under section 107 [42 U.S.C.S. § 9607].

Here, the state court involuntarily acquired control of the Orchard in the receivership proceeding. Once the receivership request was filed and a requisite showing made to the court, the law requires the appointment of a receiver. SPM's appointment and acts were pursuant to the court's order authorizing operation of the Orchard. That authorization in turn caused or certainly contributed to a release since the Dip and pesticides are hazardous substances and treating the stakes and mixing the chemicals resulted in a release. Therefore, while the court's involuntary acquisition of control of the property would exempt it from classification as a "owner or operator", since SPM caused or contributed to a release the exemption is lost and both the court and its officer would be liable under CERCLA. This result would be startlingly contrary to a large body of well settled common law concerning judicial immunity. Before this court can reach such a result,

we broaden the inquiry and consider the defenses [21] to CERCLA liability.

The statutory defenses, construed with the language of § 9607(a) that, "[n]otwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section," greatly limits defenses available to the state court and its officer from liability under CERCLA. The act of God or act of war defenses do not offer comfort to the state court or SPM. Further, the third party defense under CERCLA § 9607(b)(3) is specifically not applicable to an act of an agent, and SPM is the state court's agent.

SPM argues that derivative judicial immunity is a defense applicable under CERCLA, but the language of § 9607(a) and (b) appear to be exclusive. Judicial immunity is not mentioned and is arguably not available as a defense under CERCLA.

Such an interpretation results in the following: a business engaged in a socially useful industry with potential ecological danger can not pay its debt to its secured lender. The lender sues, seeks to foreclose on the debtor's plant, and seeks appointment of a receiver to preserve the property during the pendency of the foreclosure. The court concludes that the legal prerequisites have been met and appoints a receiver to operate the business pending foreclosure. The reasonably competent operation of the business by the receiver generates CERCLA liability arising out of activities specifically authorized and ordered by the court. Under the Pacific and Holeman's interpretation of CERCLA, the state acting through its judicial branch, the judge who specifically authorized the activi-

---

**21.** CERCLA § 9607(b) sets out the defenses to liability as follows:

(b) Defenses. There would be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—

(1) an act of God;

(2) an act of war;

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defen-

dant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

(4) any combination of the foregoing paragraphs.

ty, and the receiver would all be personally liable without any showing of fault, wrongdoing or error.

■ A judge having a personal stake in a matter before her or him is the antithesis of our judicial system. A judge may not sit on a matter in which the judge has a financial interest in the outcome. 28 U.S.C. § 455(b)(4); Washington State Code Judicial Conduct, Canon 3(C)(1)(c). The fact that under CERCLA a judge might be personally liable for the acts of a receiver he appointed would create a personal stake in the proceeding. If presiding over a matter placed a judge at personal risk for CERCLA liability as a result of a receiver's management, few rational persons would willingly expose themselves to such risk. A judge could avoid the threat of personal liability by not to appointing a receiver, but the practical consequences of such a rule would be to make it difficult to obtain a judge to hear such a proceeding. As the Supreme Court has recently pointed out in *Forrester v. White*, 484 U.S. 219, 225, 108 S.Ct. 538, 543, 98 L.Ed.2d 555 (1988):

> [i]f judges were personally liable for erroneous decisions, the resulting avalanche of suits, most of them frivolous but vexatious, would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits. The resulting timidity would be hard to detect or control, and it would manifestly detract from independent and impartial adjudication. Nor are suits against judges the only available means through which litigants can protect themselves from the consequences of judicial error. Most judicial mistakes or wrongs are open to correction through ordinary mechanisms of review, which are largely free of the harmful side-effects inevitably associated with exposing judges to personal liability.

*Id.* at 225, 108 S.Ct. at 543 (citation omitted). Even if a judge were willing to preside over such a proceeding, who would be willing to serve as receiver for a property with potential for environmental liability? Compensation for the increased risk might well be prohibitively expensive, particularly when dealing with an insolvent estate. Yet the public's need to have such a business competently managed would seem to proportionally increase with the potential risk for environmental liability arising from operation or control of such a business. A property may well be more dangerous if unattended and not operated than if managed by a professional and competent receiver skilled in the particular dangers arising from the operation. No one would willingly undertake such a task if they were to be personally liable for activities performed within generally recognized standards of performance and care. Such liability would make a receiver a personal guarantor or insurer of the results of its activities. Thus the more hazardous the property and the greater need for attention, the higher risk of liability and the lower likelihood of obtaining a person willing to perform this valuable function.

However, there is a more reasonable interpretation of CERCLA which avoids this questionable result.

■ Looking once more at § 9601(20)(A)(ii),[22] an "owner or operator" must first be a "person". Section 9601(21) provides:

> The term "person" means an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body.

Is the state court a "person"? It does not appear to be a "municipality", "commission", or "political subdivision of a State." The state court is not an "interstate body." These terms appear to apply to proprietary or executive, as opposed to judicial, functions of government. Therefore the only remaining category that the state court could arguably fit within would be that of "State." The provisions of § 9601(20)(A)(iii) defines "owner or operator" when dealing with a government by referring "to a unit of State or local gov-

**22.** See footnote 19, supra.

ernment." Section 9601(20)(D) also defines "owner or operator" by reference to "a unit of state or local government." These sections read together suggest two possible interpretations: either that all instrumentalities through which a state acts, whether executive, legislative or judicial, are covered within the definition of "person", or that a state falls within the definition of "person" only when it is acting in is executive or proprietary capacity. It is the court's opinion that the more limited meaning is the more likely. Of the five terms arguably applicable, "state, municipality, commission, political subdivision or state, or any interstate body", only "state" might arguably include any judicial function. The use of the other four more limited terms suggests that "state" should be limited to executive or proprietary activities. Certainly Congress if had intended the term "person" to extend to the courts or the state judiciary it would have so specified. For example, CERCLA § 9620(a) provides in dealing with federal facilities:

> Each department, agency, and instrumentality of the United States (including the executive, legislative, and judicial branches of the government) shall be subject to, and comply with, this Act in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 107 of this Act [42 U.S.C.S. § 9607].

Here the Congress clearly intends to submit all instrumentalities of the United States including the judicial branch of government to liability under CERCLA. By comparison the provisions of § 9601(20)(A) & (D) and § 9601(21) do not clearly include a state's judicial branch within the meaning of the term "person." As the Supreme Court has recently reaffirmed, to abrogate a state's Eleventh Amendment immunity from suit "Congress must make its intention 'unmistakably clear in the language of the statute'." *Hoffman v. Connecticut*

*Department of Income Maintenance*, 492 U.S. 96, 101, 109 S.Ct. 2818, 2822, 106 L.Ed.2d 76 (1989) (citations omitted). "Waivers of the Government's sovereign immunity, to be effective, must be 'unequivocally expressed'." *U.S. v. Nordic Village, Inc.*, —— U.S. ——, ——, 112 S.Ct. 1011, 1014, 117 L.Ed.2d 181 (1992) (citations omitted). CERCLA does not, by its terms, unmistakably make clear in unequivocal language that a state's immunity from suit for its judicial activities is waived.[23]

CERCLA's lack of a clear waiver of a state's judicial immunity combined with the ambiguous nature of its definition of "person" means that a state's judiciary acting in its official capacity is not a "person" within the terms of CERCLA § 9601(21), nor an "owner or operator" within § 9601(20)(A) or (D), and thus is not liable under § 9607. Further, state judicial immunity protects not only a state when invoking its judicial function but also the court's officers such as a receiver acting under the authority of judicial orders.

 While CERCLA does not waive a state's judicial immunity, § 9620 specifically makes the judicial branch of the federal government subject to CERCLA liability concerning federal facilities.[24] Congress can make the United States liable for judicial actions if it chooses to do so, unless there is some constitutional impediment against such legislative action. However, a waiver of immunity by the United States legislated by Congress does not also waive the personal immunity of its judicial officers. Such an attempted waiver would create grave constitutional problems regarding the separation of powers.

Judicial immunity is an ancient principle of American jurisprudence:

> As a class, judges have long enjoyed a comparatively sweeping form of immunity, though one not perfectly well defined. Judicial immunity apparently originated,

---

**23.** Congress did unequivocally waive the state's immunity from suit for actions taken in its executive capacity. *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989.) (The state held liable under CERCLA for hazardous substances inadvertently released during the course of a flood control project.)

**24.** It is quite arguable that the Orchard is not a "federal facility" subject to this waiver.

in medieval times, as a device for discouraging collateral attacks and thereby helping to establish appellate procedures as the standard system for correcting judicial error. More recently, this Court found that judicial immunity was "the settled doctrine of the English courts for many centuries, and has never been denied, that we are aware of, in the courts of this country." Besides protecting the finality of judgments or discouraging inappropriate collateral attacks, th[is] ... Court concluded, judicial immunity also protected judicial independence by insulating judges from vexatious actions prosecuted by disgruntled litigants.

. . . .

... [W]e cannot pretend that we are writing on a clean slate or that we should ignore compelling reasons that may well justify broader protections for judges than for some other officials.

. . . .

When applied to the paradigmatic judicial acts involved in resolving disputes between parties who have invoked the jurisdiction of a court, the doctrine of absolute judicial immunity has not been particularly controversial. Difficulties have arisen primarily in attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges. Here, as in other contexts, immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches.

This Court has never undertaken to articulate a precise and general definition of the class of acts entitled to immunity. The decided cases, however, suggest an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform. Thus, for example, the informal and ex parte nature of a proceeding has not been thought to imply that an act otherwise within a judge's lawful jurisdiction was deprived of its judicial character. See *Stump v. Sparkman,* 435 U.S. 349, 363, n. 12 [98 S.Ct. 1099, 1108 n. 12, 55 L.Ed.2d 331] (1978).

*Forrester v. White,* 484 U.S. at 225, 108 S.Ct. at 543 (citations omitted).

 Judicial immunity was an established, essential element of the judicial power of the sovereign when the United States Constitution was adopted, and the concept is inherent in our judicial branch of government. As a fundamental principle upon which our judiciary is founded, personal judicial immunity can not be eliminated by a simple act of Congress as this would constitute an impermissible infringement of the principle of separation of powers. This principle is the same as that advanced in support of the Constitution's Article III protection against diminution of the judge's salary. As Alexander Hamilton in No. 79 of *The Federalist Papers* said:

"In the general course of human nature, *a power over a man's subsistence amounts to a power over his will....* It was therefore necessary to leave it to the discretion of the legislature to vary its provisions in conformity to the variations in circumstances, yet under such restrictions as to put it out of the power of that body to change the condition of the individual for the worse. A man may then be sure of the ground upon which he stands and can never be deterred from his duty by the apprehension of being placed in a less eligible situation."

Alexander Hamilton, *in The Federalist Papers* 472 (New Am.Library 1961) (1788) (emphasis in original).

A judge might be deterred from his duty if faced with personal liability for its exercise. For example, Congress has given the courts discretion in certain circumstances to grant probation to defendants found guilty of crimes. Could Congress then act to make a judge liable for all damages resulting from crimes committed by a defendant while on probation? This would be an impermissible interference with the judicial process by creating a personal stake for the judge making the probation decision. Such a result is alien to our concept of an independent judiciary and would be

an unconstitutional intrusion on the judicial power by the Congress.

■ In *United States v. Security Industrial Bank,* 459 U.S. 70, 78, 103 S.Ct. 407, 412, 74 L.Ed.2d 235 (1982), the Supreme Court has directed that when faced with two different interpretations of a statute one of which poses serious constitutional problems, a court should adopt the interpretation which avoids the constitutional conflict. The interpretation of CERCLA which Pacific and Holeman advance creates a fundamental constitutional conflict. A more reasonable interpretation of CERCLA § 9620's language would be that although the United States is declaring itself subject to liability under CERCLA, this provision should not be construed to extend liability beyond the United States itself; and therefore federal judicial officers and agents acting in an official capacity are not personally liable under CERCLA.

This takes the interpretive process back to the general provisions of CERCLA.

CERCLA § 9607(a) provides: "Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of the subsection" (act of God, act of war or act of a third party) certain categories of persons will be liable under CERCLA. These categories include "any person who at the time of disposal operated any facility at which such hazardous substances were disposed of." § 9607(a)(2). SPM, as receiver appointed by the state court or custodian appointed by the bankruptcy court and pursuant to court orders, did operate the Orchard at the time of the disposal in question. At common law, derivative judicial immunity shields SPM from personal liability for activities done within the scope of authority granted by the supervising court. While CERCLA's language does contain a general waiver of all non specified defenses and judicial immunity is not specified, the legislative history provides "It is intended that issues of liability not resolved by this act ... shall be governed by traditional and evolving principles of common law." [25]

■ In *Joslyn Manufacturing Co. v. T.L. James Co.,* 893 F.2d 80, 82 (5th Cir. 1990) the Fifth Circuit Court of Appeals ruled that CERCLA does not abolish or replace the common law rules concerning parent corporation liability for the acts of its subsidiaries.[26] Thus, common law principles are relevant in determining CERCLA liability.

Given the constitutional and practical problems that must be resolved if CERCLA is interpreted to abrogate judicial immunity, this court concludes that Congress in passing CERCLA did not waive judicial immunity as to judicial acts of federal judicial officers. CERCLA's language does not clearly and unequivocally waive federal judicial immunity and, in the absence of specific language to this effect, this court declines to interpret the statute as creating a serious constitutional conflict involving Congress' power to waive judicial immunity with its detrimental impact on judicial independence. Considering the legislative history, it is more probable that Congress simply didn't consider this problem.[27] If

25. 126 CONG.REC. § 14.964 (daily ed. Nov. 24, 1980) (floor statement of Sen. Stafford, sponsor), quoted in, *United States v. Chem–Dyne Corp.,* 572 F.Supp. 802, 807 (S.D.Ohio 1983). Accord 126 CONG.REC. H11,787 (daily ed. Dec. 3, 1980) (statement of Rep. Florio, sponsor).

26. *See also,* Mitchel; *Joslyn Manufacturing Co. v. T.L. James & Co., Inc.; Integrating CERCLA with the American Common Law Tradition,* 17 Colum.J.Envtl.L., 1, 53 (1992).

27. Courts have generally struggled with CERCLA's ambiguous language and lack of legislative history. *See, e.g., United States v. Maryland Bank & Trust Co.,* 632 F.Supp. 573, 578 (D.Md. 1986) (referring to CERCLA as "a hastily conceived compromise statute"); *United States v.*

*Northeastern Pharmaceutical 7 Chem. Co.,* 579 F.Supp. 823, 838 n. 15 (W.D.Mo.1984) ("CERCLA ... is a hastily drawn piece of compromise legislation marred by vague terminology and deleted provisions.... The courts are once again placed in the undesirable and onerous position of construing inadequately drawn legislation.")

As at least one commentator has observed:
 Unfortunately, in the rush to enact CERCLA ... Congress created a hasty and confusing piece of compromise legislation. Among other things, the courts have had to interpret ambiguous grammar and vague congressional intent. The courts' work has been more difficult due to the hurried nature in which the Act was drafted and a series of poorly docu-

Congress intended to change a long established rule of common law it would require specific mention of that rule. *Dewsnup v. Timm*, — U.S. —, —, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992). This would certainly be the case where constitutional problems of the magnitude faced here are encountered.

■ Thus the court concludes that judicial immunity and derivative judicial immunity survive under CERCLA as long as the judge and the officer of the court are performing judicial functions. Here, the Order, Amended Order, and subsequent orders of the state court and bankruptcy court which authorized and approved SPM's stewardship of the Orchard are unquestionably judicial in nature. Thus, they fall within the mantle of judicial immunity for the judges and derivative judicial immunity for SPM in both its roles as state court receiver and bankruptcy custodian. Personal liability for the acts of SPM thus turn on the traditional common law rules applicable to when a receiver or trustee might be personally liable for its actions.

## IV. RECEIVER OR CUSTODIAN LIABILITY UNDER MODEL TOXIC CONTROL ACT.

Pacific and Holeman argue that SPM is liable for contribution under the MTCA. RCW § 70.105D.010–.921. The Washington State Supreme Court has recently ruled that there is no private right of action for contribution under the MTCA. *Bird–Johnson Corporation v. Dana Corp.*, 119 Wash.2d 423, 833 P.2d 375 (1992). *Bird–Johnson* is a narrow decision on the question certified by the federal district court, as the state court declined to consider the availability of contribution under RCW § 4.22.[28] *Id.* at 425, n. 1, 833 P.2d 375 (also see J. Johnson dissent at 429–33, 833 P.2d 375). Since a independent right of contribution may be available via RCW § 4.22 for MTCA liability, *Bird–Johnson* does not completely settle the issue.

■ The MTCA has been modeled upon and is very similar to CERCLA.[29] To be liable under the MTCA one must be a "person". RCW § 70.105D.040(1). "Person" is specially defined in RCW § 70.105D.020(7) as follows:

"Person" means an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, state government agency, unit of local government, federal government agency, or Indian tribe.

When compared with CERCLA § 9601(21)[30], the MTCA's definition of "person" is more narrowly drawn. The MTCA is not a blanket or general submission of the state in all its governmental functions to liability under MTCA. Rather, liability is provided only for state government agencies and units of local government. Clearly, neither would apply to the state judiciary.

■ Additionally, there is no provision in the MTCA comparable to CERCLA § 9620(a) specifically making the state judiciary subject to liability. Thus the MTCA does not submit the state to liability when it is performing its judicial functions; there is no waiver of liability, nor a specific waiver of judicial immunity. Thus, SPM would not be liable under MTCA when acting as

mented congressional compromises. While the 1986 SARA amendments to CERCLA enlighten a few areas, the 1986 legislative history reflects more ratification than instruction. In other words, Congress chose to acquiesce to judicial interpretations rather than direct them.

Bruce G. MacIntyre, Comments, *Through the Looking Glass: A Comparison of Covered Persons, Defenses, and Liability Under CERCLA and the Washington State Model Toxic Control Act of 1988 (Initiative 97, 1988 General Election)*, 25 Gonz.L.Rev. 253, 256 (1989/90) (footnotes omitted).

28. Under Washington law, RCW § 4.22.040 provides an independent right of contribution where parties are jointly and severally liable to each other. The MTCA at RCW § 70.-105D.040(2) provides that "[e]ach person who is liable under this section is strictly liable, jointly and severally, for all remedial action costs and for all natural resource damages resulting from the releases or threatened releases of hazardous substances...."

29. 25 Gonz.L.Rev. at 254.

30. *See page 658, supra.*

an officer of the state court pursuant to that court's order.

▇▇▇ The court now considers whether SPM is personally liable for violations of the MTCA when it was acting as a bankruptcy custodian. The sole reference to in the MTCA to the federal government is the inclusion of "federal government agency" in RCW § 70.105D.020(7). The federal judiciary is not an agency of the federal government. Thus, the MTCA does not apply to the United States when performing its judicial functions. Further, there is no evidence that the United States has ever waived its sovereign immunity in regard to liability under the MTCA. Although it might be argued that 28 U.S.C. § 959(b)[31] requires a bankruptcy custodian to comply with applicable state law in managing and operating a property, that statute is not a clear unequivocal waiver of sovereign immunity on the part of the United States if the custodian violates the law. Rather, the more reasonable interpretation of § 959(b) would be that in the case of such a violation the bankruptcy estate is liable for the violation. Violation of a state law does not per se make a court officer personally liable. *Better Brite*, 483 N.W.2d at 574.

Thus, neither the state acting through its judicial officers nor the federal government acting through its judicial officers are liable for violation of the MTCA.

## V. RECEIVER OR CUSTODIAN LIABILITY UNDER WASHINGTON'S HAZARDOUS WASTE MANAGEMENT ACT.

Pacific and Holeman argue that SPM is liable to them under the HWMA. RCW § 70–105.005–900. Unlike the MTCA, the HWMA specifically provides for a private cause of action. RCW § 70.105.097.

▇▇▇ To be liable under the HWMA one must be a "person".[32] "Person" is specifically defined in RCW 70.105.010(7) as "any person, firm, association, county, public or municipal or private corporation, agency, or other entity whatsoever." Like the MTCA, the HWMA does not appear to be a blanket or general submission of the state in all of its governmental functions to liability under the HWMA. The state judiciary is not a public or municipal corporation nor is it thought of as an "agency" or even an "entity". Thus the same reasoning which was applicable to the issue of waiver of judicial immunity under MTCA is equally applicable under HWMA.

Similarly, the prior rationale limiting a bankruptcy court officer's personal liability for violations of the MCTA is equally applicable to violations of the HWMA.

▇▇▇ Thus, neither the state nor the federal government acting in their judicial capacities through their judicial officers are liable for violation of the HWMA. Officers of the court, receivers, trustees, or custodians may be personally liable under the HWMA for acts outside the scope of their authority, and may also be liable to their respective estates for damages resulting from violation of the HWMA if their acts are not consistent with reasonable business judgment. The respective estates would be liable for violations of the HWMA by its managers.

**31.** 28 U.S.C. 959 provides:

(a) Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.

(b) Except as provided in Section 1166 of Title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

**32.** *See, e.g.,* RCW § 70.105.080 (civil penalties); RCW § 70.105.085 (criminal penalties); RCW § 70.105.090 (gross misdemeanor); RCW § 70.-105.095 (penalty for noncompliance and appeals); and RCW § 70.105.097 (actions for damages and attorneys fees).

## VI. THE PESTICIDE EXCEPTIONS TO LIABILITY UNDER CERCLA AND MTCA.

Both CERCLA and MTCA contain exceptions to liability for application of pesticides. CERCLA § 9607(i); RCW § 70.-105D.040(3)(d). SPM argues that the complained of activities fall within these exceptions.

The treatment of stakes with the Dip at the Orchard involved the use of pentachlorophenol, a pesticide registered under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). The Dip was used because it preserves the stakes longer than diesel would alone. Remedying spillage of the Dip was the major cause of the cleanup costs. Does this usage come within the pesticide exceptions to CERCLA and MTCA?

### A. *The Pesticide Exception Under CERCLA.*

The CERCLA pesticide exception provides:

> *(i) Application of registered pesticide product.* No person (including the United States or any State or Indian tribe) may recover under the authority of this section for any response costs or damages resulting from the application of a pesticide product registered under the Federal Insecticide, Fungicide, and Rodenticide Act [7 USCS §§ 136 et seq.]. Nothing in this paragraph shall affect or modify in any way the obligations or liability of any person under any other provision of State or Federal law, including common law, for damages, injury, or loss resulting from a release of any hazardous substance or for removal or remedial action or the costs of removal or remedial action of such hazardous substance.

CERCLA § 9607(i). Section 9607(i) exempts the "application" of a covered pesticide from CERCLA liability, but retains liability for a "release" of such a pesticide.

■■■ "Application" is not defined in CERCLA or FIFRA. "Release" is defined in CERCLA § 9601(22) as: "any spilling, leaking, pumping, pouring, emitting, emp-

tying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), ..." "Spilling" is specifically included in the definition of release. Therefore, SPM's allowing excess Dip to drain off the stakes and the spillage that resulted is a "release" rather than "application". Likewise "abandoning" or "discharging" the barrels would appear to constitute a "release" as opposed to an "application".

■■■ SPM argues that, despite the exercise of reasonable care, a certain amount of incidental spillage is inevitable in the use of any pesticide and such incidental spillage is included within the application exception. Even if the court were to conclude that an incidental spillage rule is part of the application exception, there is insufficient evidence for this court to conclude that the spillage complained of here was merely incidental.

Further, whether SPM used the pentacholorphenol as a pesticide is a factual issue. Exempting the use of a pesticide in a manufacturing process does not further the policy behind the pesticide application exception. The Dip was not applied to crops, although its use here might protect against deterioration of the stakes as a result of pest activities. Again, the evidence is insufficient for the court to determine whether the use of pentachlorophenol filled a pesticide function and thus qualified for the exception.

In summary, there is insufficient evidence to resolve this case on the basis of CERCLA's pesticide exception.

### B. *The Pesticide Exception to MTCA.*

■■■ The MTCA pesticide exception provides: "(3) the following persons are not liable under this section: .... (d) any person who, for the purpose of growing food crops, applies pesticides or fertilizers without negligence and in accordance with all applicable laws and regulations." RCW § 70.105D.040 The exemption applies to

**664**

pesticide use for growing food crops. SPM's use of the Dip for manufacturing the stakes is not an application of pesticides for growing food crops.

■ Rather, the treatment of stakes fits the MTCA's definition of "release" found at RCW § 70.105D.020(10).[33] The complained of activities of SPM do not qualify for pesticide exclusion from liability under the MTCA.

## VII. AVAILABILITY OF THE DEFENSES OF ESTOPPEL AND WAIVER UNDER CERCLA AND MTCA.

SPM asserts that it has equitable defenses to Pacific and Holeman's claims, based on these claimants actions which constitute estoppel, waiver and/or accord and satisfaction. The claimants respond those defenses are not available under CERCLA's and MTCA limitation of defenses provisions. 42 U.S.C. 9607(a) & (b); RCW § 70.-105D.040(1) & (3); *U.S. v. Western Processing Co., Inc.*, 734 F.Supp. 930, 939 (W.D.Wash.1990).

If SPM is ultimately found liable it would be entitled to seek contribution "from any other person liable or potentially liable." 42 U.S.C. 9613(f). This section goes on to provide "In resolving contribution claims, the court may allocate response costs among parties using such equitable factors as the court determines are appropriate." The claimants actions may be considered in that aspect of the case where this court "will be free to allocate responsibilities according to any combination of equitable factors it deems appropriate." *O'Neil v. Pecillo*, 883 F.2d 176, 183 (1st Cir.1989).

## VIII. CONCLUSION

■ Generally only the appointing court has jurisdiction to determine whether a court appointed officer should be personally liable for actions taken within the scope of the officer's authority. The appointing court is in the best position to decide if its officer faithfully performed its duties and thus is entitled to protection

from liability by derivative judicial immunity. However, pursuant to Bankruptcy Code § 543, this court has the authority to review SPM's performance as receiver for the Grant County Superior Court.

■ Court officers are not personally liable to third persons for acts taken within the scope of their authority, unless those wrongful acts are willful and deliberate or negligent. Court officers are not personally liable to third persons under the doctrine of strict liability for engaging in an abnormally dangerous activity within the scope of their authority. SPM's activities complained of herein based on the record before the court were within the scope of its authority and were neither willful deliberate wrongs nor were they negligent.

■ Court officers may be surcharged for the benefit of the estate for wrongful acts that are willful and deliberate, negligent, or beyond the spectrum of reasonable business judgment. SPM's acts were not willful deliberate wrongs. There is insufficient evidence to rule that SPM's acts were negligent or beyond the spectrum of reasonable business judgment.

■ Court officers are not personally liable for violations of CERCLA, MTCA and HWMA when acting within the scope of their authority and pursuant to court order. The facts are insufficiently developed at this time to allow determinations as to whether SPM is protected from personal liability under these statutes by derivative judicial immunity, and whether SPM's acted with reasonable business judgment.

The court will issue an order consistent with these rulings.

---

**33.** "Release" means any intentional or unintentional entry of a hazardous substance into the environment, including but not limited to the abandonment or disposal of containers of hazardous substances.